## BERWIND–WHITE COAL–MINING CO. et al. v. UNITED STATES, and four other cases.

(District Court, E. D. Pennsylvania. November 25, 1925.)

Nos. 3271, 3273, 3275, 3285, 3317.

1. **Commerce** ⚖️88—Rule as to finality of orders of Interstate Commerce Commission stated.

Orders of Interstate Commerce Commission are final, unless beyond power which it could constitutionally exercise, or beyond its statutory power, or based on a mistake of law.

2. **Commerce** ⚖️91—Order of Interstate Commerce Commission, regular on its face, may be set aside, if confiscatory or unreasonable.

Order of Interstate Commerce Commission, regular on its face, may be set aside if, on facts found, it is confiscatory and in violation of constitutional prohibition against taking of property without due process of law, or if authority has been exercised in unreasonable manner.

**3. Commerce ⚖══91—Court determining validity of order of Interstate Commerce Commission will not consider its expediency, or whether it would have made similar ruling.**

In determining validity of order of Interstate Commerce Commission, court will consider only whether Commission acted within its power, and not the expediency or wisdom of the order, or whether on like testimony it would have made a similar ruling.

**4. Commerce ⚖══95—Findings of Interstate Commerce Commission prima facie true; extent of review stated.**

Findings of Interstate Commerce Commission are prima facie true, and order of Commission, though reviewable, will not be examined, further than to determine whether there is substantial evidence to support it.

**5. Carriers ⚖══32(2)—Both railroads and shippers have right to use private cars.**

Right of both railroads and shippers to use private cars is clearly recognized by law, and can be abolished only by Congress.

**6. Commerce ⚖══88—Reasonableness of order within powers of Interstate Commerce Commission is question for Commission.**

Unless order of Interstate Commerce Commission is not within its powers, its reasonableness is administrative question, for Commission to decide, though it cannot so arbitrarily exercise its discretion as to transcend its conferred power.

**7. Carriers ⚖══23—Interstate Commerce Act reasonably construed to effect purpose intended.**

Interstate Commerce Act (Comp. St. § 8563 et seq.) should be reasonably interpreted to accomplish purpose intended, to wit, reasonable charges without unjust discrimination or preference.

**8. Carriers ⚖══32(1)—Shippers not required to be treated alike under all circumstances, and only unjust and unreasonable discrimination is illegal.**

Interstate Commerce Act, § 3, as amended (Comp. St. Ann. Supp. 1923, § 8565), does not require that all shippers shall be treated alike under any and all circumstances, and every discrimination is not illegal, but only that which is unjust and unreasonable.

**9. Carriers ⚖══32(1)—In determining whether discrimination is unjust, question whether transportation effected is under substantially similar conditions must be considered.**

In determining whether discrimination resulting from manner of car distribution is unjust or unreasonable, question whether transportation effected is under substantially similar circumstances and conditions must be considered.

**10. Commerce ⚖══85—Interstate Commerce Act, as relates to Commission's power to suspend rules in emergency, construed.**

Interstate Commerce Act, § 1, subd. 15, as added and amended (Comp. St. Ann. Supp. 1923, § 8563), authorizing Commission in case of emergency to suspend rules and establish just and reasonable directions with respect to

car service, applies only to unexpected conditions, and does not authorize suspension of rules to meet anticipated conditions, or placing in effect of emergency orders previously condemned as unjust and unreasonable.

**11. Commerce ⚖══16—Coal mining is not "commerce."**

Coal mining is not "commerce."

**12. Commerce ⚖══85—Interstate Commerce Commission cannot require distribution of privately owned cars among shippers generally in time of shortage.**

Interstate Commerce Commission cannot require railroads to distribute among shippers generally in time of shortage privately owned coal cars, for use of which owners receive compensation at a rate fixed by Commission.

**13. Carriers ⚖══32(2)—That owners of private cars enjoy use of disproportionately large part of carrier's facilities is not discriminatory.**

That owners of private cars enjoy use of a disproportionately large part of facilities of carrier is not discriminatory, unless other shippers are thereby deprived of use of those facilities.

**14. Commerce ⚖══88—Order of Commission, based on discrimination, must be restricted to scope of discrimination actually shown.**

Order of Interstate Commerce Commission, based on discrimination by carrier, must be restricted in its scope to discrimination actually shown.

**15. Eminent domain ⚖══61, 69—Private property cannot be taken for public use without compensation, nor for private use with or without compensation.**

Private property cannot be taken for public use without just compensation, and cannot be taken for private use with or without compensation.

**16. Commerce ⚖══88—Eminent domain ⚖══2(8)—Order of Interstate Commerce Commission, abolishing "assigned car rule," held unreasonable and arbitrary, and to deprive private car owners of their property without compensation, in violation of the Fifth Amendment.**

Under Interstate Commerce Act, § 1, subds. 3, 6, 10–12, 14, 15, as added and amended (Comp. St. Ann. Supp. 1923, § 8563), and sections 3 and 15 (sections 8565, 8583), an order of the Interstate Commerce Commission universally abolishing "assigned car rule," relating to distribution of coal cars to mines during times of shortage, *held* unjust, unreasonable, and an unlawfully arbitrary exercise of power, which deprived railroads of their rights to regulate their internal affairs and private car owners of their property without compensation, in violation of Const. Amend. 5.

In Equity. Five suits, by the Berwind-White Coal-Mining Company and others, by the Bethlehem Steel Company and others, by the Rainey-Wood Coke Company and others, by the Akron, Canton & Youngstown

Railway Company and others, and by the Public Service Electric & Gas Company, all against the United States, or the United States and the Interstate Commerce Commission. On final hearing. Decrees for plaintiffs.

John Hampton Barnes, of Philadelphia, Pa., August G. Gutheim, of Washington, D. C., Charles Heebner, of Philadelphia, Pa., and Walker D. Hines and Wayne Johnson, both of New York City, for Berwind-White Coal-Mining Co. and others.

Frederic L. Ballard, of Philadelphia, Pa., Frederick H. Wood, H. A. Moore, Paul D. Cravath, and Charles S. Belsterling, all of New York City, Richard V. Lindabury, of Newark, N. J., and Charles MacVeagh, of New York City, for Bethlehem Steel Co. and others.

John Lord O'Brian, of Buffalo, N. Y., and Ralph J. Baker, of Harrisburg, Pa., for Rainey-Wood Coke Co. and others.

F. M. Rivinus and Henry Wolf Bikle, both of Philadelphia, Pa., W. S. Bronson, of Richmond, Va., Francis I. Gowen and W. L. Kinter, both of Philadelphia, Pa., W. A. Northcutt, of Louisville, Ky., C. C. Paulding, of New York City, Theodore W. Reath, of Philadelphia, Pa., and C. M. Sheafe, Jr., of New York City, for Akron, C. & Y. Ry. Co. and others.

Frank Bergen, of Newark, N. J., Henry S. Drinker, Jr., of Philadelphia, Pa., William H. Speer, of Newark, N. J., and August G. Gutheim and James W. Carmalt, both of Washington, D. C., for Public Service Electric & Gas Co.

Blackburn Esterline, Asst. Sol. Gen., of Washington, D. C., and George W. Coles, U. S. Atty., of Philadelphia, Pa., for the United States.

R. Granville Curry, of Washington, D. C., for Interstate Commerce Commission.

Greever & Gillespie, of Tazewell, Va., and A. M. Liveright, of Clearfield, Pa., for intervening defendants.

Before WOOLLEY, Circuit Judge, and THOMPSON and THOMSON, District Judges.

THOMPSON, District Judge. These suits were brought for the purpose of enjoining, setting aside, and annulling an order of the Interstate Commerce Commission relating to the distribution of coal cars among bituminous coal mines in times of car shortage. On March 22, 1921, the Commission instituted an investigation, upon its own motion, into and concerning the reasonableness and propriety of the then existing car distribution rules, in so far as they apply to privately owned coal cars and cars furnished for railroad fuel coal, with a view to prescribing such just and reasonable rule or regulation as might appear to be necessary. All of the railroads subject to the jurisdiction of the Commission were made parties respondent to the proceeding. The car distribution rule under investigation is what has been known as the "assigned car rule."

The cars for loading with bituminous coal involved in the investigation and in the order in controversy are "system cars," or cars of railroad ownership set for loading at mines upon the line of the owning carrier, or such as may be on its line of railroad and not owned by some specific shipper or restricted as to use, and "assigned cars." The latter are classified as described in the "assigned car rule," which has been practiced generally by the railroads during periods of coal car shortage since 1907, as follows:

(A) Assigned cars are of three classes: (1) System fuel cars; that is, cars assigned to mines on a coal-loading railroad for the fuel coal of that railroad. (2) Foreign fuel cars; that is, cars of another railroad assigned to mines on a coal-loading railroad for the fuel of the former. (3) Private cars; i. e., cars not railroad owned, assigned for the coal of the owner of the cars to its own or other mines.

(B) All assigned cars must be placed at the mines to which they are assigned.

(C) If the number of cars equals or exceeds the number of cars to which the mine is that day entitled under the prevailing rate of system car distribution, the mine is not entitled to any system cars for loading that day.

(D) If the number of assigned cars does not equal the number of cars to which the mine is that day entitled under the prevailing rate of system car distribution, the mine is allowed sufficient system cars in addition to bring its total placement that day up to the distributive share to which it is entitled.

On June 13, 1923, the Commission, after conducting hearings and taking testimony, issued its report and entered the following order:

"It is ordered, that each of the respondents be, and each is hereby, notified and required to cease and desist, on or before September 1, 1923, and thereafter to abstain, from maintaining and enforcing, in so far as such respondent maintains and enforces, a regulation or practice whereby in the distribution of cars for the transportation of coal among the bituminous coal mines served by such respondent, whether located upon its line or customarily dependent upon it for car

supply, private cars or cars for the loading of bituminous coal for railway fuel are placed at any such mine in excess of the pro rata allotment and distribution of cars for coal loading currently made to any other of such mines which do not receive private cars or cars for railway fuel and which are on the same division or district established by such respondent for the distribution of cars.

"It is further ordered, that each of the respondents which distributes cars to bituminous coal mines located upon its line or customarily dependent upon it for car supply be, and each is hereby, notified and required to establish on or before September 1, 1923, and thereafter to maintain and enforce a regulation and practice whereby all cars distributed by such respondent to such mines must be distributed on a pro rata basis, and if cars are assigned or consigned to any of such mines and if such cars are placed at the mines to which assigned or consigned, they must be so placed that every mine on the same division or district established by respondent for the distribution of cars shall receive the same pro rata share of the total number of available cars, whether assigned, consigned, or unassigned, which are distributed to all mines on such division or district, and that all such assigned or consigned cars must be counted and charged against the mines at which they are placed in the same manner and to the same extent that unassigned cars are counted and charged."

For report, see 80 Interst. Com. Com'n R. 520.

Thereafter, upon petition of railroads and owners of private coal cars, the Commission on October 5, 1923, reopened the proceeding and held further hearings, and on September 23, 1924, issued its further report and order affirming the order previously made (93 Interst. Com. Com'n R. 701); the effective date of the order meanwhile having been extended from time to time to March 1, 1925.

Prior to 1907, the practice in the distribution of coal cars among the mines upon the lines of the railroads, in times of car shortage, was to establish a pro rata distribution of the available system coal cars among the mines in proportion to the rated daily output capacity of the mines. Thus, if the available supply of system cars for delivery to the mines was 1,000 and the total daily output capacity of the mines in the district affected by car shortage was 2,000 carloads, each mine would receive 50 per cent. of the system cars available, so that, if the daily rating of a mine was 100 carloads, it would receive but 50 system cars. The practice, with some exceptions, however, was not to count against the mine's share railroad fuel cars or private cars assigned to that mine, but they were placed at the mines to which assigned in as great numbers as the facilities of the railroad would permit, and mines loading railroad fuel coal or coal for private car owners received an equal pro rata share of system cars with all other mines.

That practice resulted in complaints before the Commission in the cases of Railroad Commission of Ohio et al. v. Hocking Valley Railroad Co., and Same v. Wheeling & Lake Erie Railroad Co., 12 Interst. Com. Com'n R. 398. Those cases involved the practice of the carriers in not counting foreign railroad fuel cars and private cars against the mines to which assigned. The Commission held the practice discriminatory and ordered its discontinuance. In the case of Traer v. Chicago & Alton Railroad Co., 13 Interst. Com. Com'n R. 451, the Commission, following the Hocking Valley decision, held that cars used by railroads upon their own lines for their own necessary fuel supply may be given in any numbers to the mine or mines from which such fuel supply is received, but that the failure to count such fuel cars against the mine or mines was discriminatory and that practice was ordered abolished. The orders upon appeal were held by the Supreme Court, in Interstate Commerce Commission v. Illinois Central Railroad Co., 215 U. S. 452, 30 S. Ct. 155, 54 L. Ed. 280, to be within the power conferred upon the Commission to control the use of the equipment of the railroads in order to prevent discrimination against or undue preference of miners and shippers of coal in the distribution of coal cars in time of car shortage. The rule laid down by the Commission in those cases has come to be known as the "Hocking Valley-Traer rule," and was adhered to by the Commission and practiced by the railroads until the time of federal control, when a rule substantially similar in effect was adopted with the power of assignment in the Car Service Section of the Railroad Administration, and, after the termination of federal control, the Commission continued in effect the Hocking Valley-Traer rule.

Suit No. 3285 is brought by 35 railroad companies, common carriers by railroad, engaged in interstate commerce, and subject, under the Act to Regulate Commerce, to the orders of the Commission. They are dependent upon steady continuous supply of bituminous coal of suitable quality and in

sufficient quantity for the operation of their locomotives and conducting their business as common carriers. About 28 per cent. of the total annual production of bituminous coal is required for the operating necessities of the railroads of the United States and that coal is obtained by the various railroads through various methods. The lines of some of the railroads are operated through coal-producing regions and they obtain all or part of their fuel coal from mines on their own lines. Others, on whose lines no bituminous coal is produced, from mines located upon other railroads. The mines from which the fuel is supplied are either (1) owned outright and operated by the railroads for their fuel supply; or (2) they are owned and operated by subsidiary mining corporations, controlled by the railroads through ownership of stock; or (3) they are leased and operated by the railroads for fuel supply; or (4) are privately owned and the railroads purchase either the entire output or part thereof.

These mine sources are selected with reference to convenience of location for distribution of coal to the places of use, and with reference to dependability of quantity and quality of output for the particular requirements of use. The extent of the capacity of the railroads to conduct their business as common carriers depends, therefore, upon the quantity of their proper fuel supply. Many of the plaintiffs have equipped themselves with coal cars of special design not available for commercial use. These cars and coal cars designated for railroad fuel loading, whether system fuel cars or foreign railroad fuel cars, are assigned to the several mines furnishing fuel supply to the extent necessary for the operations of the railroads, but are counted against the share of the mine in times of car shortage.

In all the four other suits, the petitioners are owners of private cars which are used for the loading and transportation of bituminous coal. In the case of Bethlehem Steel Company et al., No. 3273, the plaintiff, Bethlehem Steel Company, is engaged in the manufacture, sale, and shipment of iron and steel products at plants operated by it at Bethlehem, Reading, Lebanon, Coatesville, Steelton, and Johnstown, Pa., Sparrow's Point, Md., and Lackawanna, N. Y. The Bethlehem Mines Corporation produces bituminous coal at mines owned by it in Pennsylvania and West Virginia for consumption by the Bethlehem Steel Company. The Bethlehem Steel Corporation, by stock ownership, controls the Bethlehem Steel Company and

9 F.(2d)—28

the Bethlehem Mines Corporation. These plaintiffs own 3,975 coal cars, representing an investment of more than $8,000,000, which are used in the transportation of bituminous coal from the mines of the Mines Corporation to the plants of the Steel Company. The steel plants represent an investment of more than $408,000,000, and employ approximately 45,000 men, and the coal mines represent an investment of more than $68,000,000, and employ approximately 7,800 men.

Bethlehem's mines are located on and served by the lines of the Pennsylvania, the Baltimore & Ohio, the Buffalo, Rochester & Pittsburgh, and the Cambria & Indiana Railroads. Coal mines operated by Bethlehem were acquired and are operated to produce coal of specific and unvarying metallurgical quality and in constant and adequate quantities necessary for production of the grades of steel made at its plants. The productive capacity of these mines is approximately 9,500,000 tons annually, all of which is necessary for the requirements of the steel plants, and is, with unimportant exceptions, not sold commercially. These mines were selected and the 3,975 private cars were acquired by Bethlehem to meet its necessities in producing special grades of steel for such products as steel rails, bridge steel, car wheels and axles, automobile steel, and ordnance steel, of which latter product Bethlehem has produced more than half of all ever used by the United States government.

It was found that Bethlehem could not rely upon bituminous coal purchased indiscriminately from available mines, because it is necessary to have definite knowledge of the properties of the coal used in its coke ovens in order to produce the special grade of steel necessary in each steel product manufactured in its plants. Chemical impurities, such as phosphorus and sulphur, when present in improper or unknown quantities in coking coal, produce impure coke, which, in turn, results in impure and defective steel. Its coke is produced in by-product ovens at its various plants. The quality of the coke produced, dependent upon the quality and known contents of the coal used, is essential to the carrying on of this industry.

In addition to the necessity of having coal of proper and known physical properties in order to produce the proper quality of steel, coking coal of improper kind and quality results in the crumbling of the coke produced, by reason of its being of insufficient physical strength to bear the burden placed upon it in the blast furnaces, and is also destructive of

the coke ovens, through swelling within them, resulting, when a coke oven is thus destroyed, in the expense and delay of rebuilding the oven and the interruption of the operation and production of the plaintiff's plants. As bearing upon the necessity of a continuous, uninterrupted supply from the mines, it is an established fact that metallurgical coking coal, not only cannot be successfully stored in substantial quantities for extended periods, because of the risk of spontaneous combustion, but that such storage causes the coal to lose its properties essential to coking, and renders it useless for metallurgical processes.

In the Bethlehem Steel Company suit, the United States Steel Corporation and its subsidiaries, the Illinois Steel Company, the Carnegie Steel Company, the American Steel & Wire Company, the National Tube Company, the American Sheet & Tin Plate Company, the United States Coal & Coke Company, the United States Fuel Company and H. C. Frick Coke Company, are intervening plaintiffs. The United States Steel Corporation owns 6,029 private cars, in which the products of the mines of the United States Coal & Coke Company, the United States Fuel Company, and H. C. Frick Coke Company are shipped to the respective plants of the steel manufacturing subsidiaries of the United States Steel Corporation. The Illinois Steel Company, at its plants at Gary and Joliet, Ill., operates by-product coke ovens, where coke is manufactured from certain grades of bituminous coal for use in making steel. The gas secured from the by-product coke in Gary is furnished to the Gary Heat & Light Company, which supplies the city of Gary with heat, light, and power, and the remainder of the gas is used in the process of the manufacture of steel by the Steel Company. The bituminous coal thus used is shipped from the Kentucky and West Virginia mines of the United States Coal & Coke Company, and from the Benton, Ill., mines of the United States Fuel Company.

The Illinois Steel Company manufactures steel products at Gary, Ind., South Chicago and Joliet, Ill., and Milwaukee, Wis. The Carnegie Steel Company is engaged in the manufacture of steel products at various mills and furnaces located in the western part of Pennsylvania and eastern part of Ohio. The American Steel & Wire Company manufactures steel and wire products at its various mills in Massachusetts, New Jersey, Pennsylvania, Ohio, Indiana, Illinois, and Alabama. The National Tube Company manufactures wrought pipe and tubular goods and steel rails at its plants in the western part of Pennsylvania and in Ohio and West Virginia. The American Sheet & Tin Plate Company is engaged in the manufacture of sheet steel and tin plates at its various mills, located in the western part of Pennsylvania and Ohio, West Virginia, and Indiana. The United States Coal & Coke Company is engaged in the mining and shipping of coal at its mines, located at Lynch, Ky., at Gary, W. Va., and at Phillipi, W. Va. The United States Fuel Company is engaged in mining and shipping coal at Benton, Ill. The H. C. Frick Coke Company is engaged in mining and shipping coal at its various mines in Pennsylvania.

Some of the subsidiary steel companies, in their manufacture of steel, operate by-product coke ovens where coke is manufactured from certain grades of bituminous coal for use in making steel. This is the case with the Illinois Steel Company, the American Steel & Wire Company, and the National Tube Company. The Carnegie Steel Company uses large quantities of gas and steam coal in its production of steel, as does also the American Sheet & Tin Plate Company. The coal thus used is transported from the mines of the affiliated coal and coke companies partly in privately owned cars. This group of companies has invested over $16,-000,000 in their privately owned cars, and, unless such cars are available in times of car shortage, the result will follow of curtailing the manufacture of coke and closing down the mills, and throwing out of employment many thousands of men.

The intervening plaintiffs, the Steel Company of Canada, Limited, the Cleveland Cliffs Iron Company, and Perry Iron Company, are owners in undivided one-third interest of 400 private coal cars, and undivided one-third interest in the Mather Collieries at Mather, Pa. The Steel Company of Canada manufactures iron and steel products at Hamilton, Ontario. The Cleveland Cliffs Iron Company operates blast furnaces and supplies raw material to the blast furnaces at Cleveland, Ohio, and Warren, Ohio. The Perry Iron Company manufactures pig iron at Erie, Pa., and has a stock ownership interest in blast furnaces at Toledo and Canton, Ohio. The manufacturing conditions and necessities of these interveners are substantially similar to those of the Bethlehem Steel Company. The Youngstown Sheet & Tube Company, intervening plaintiff, is engaged in the manufacture of iron and steel at plants at East Youngstown, Brier Hill, Hubbard, War-

ren, Girard, and Zanesville, Ohio, at Indian Harbor, Ind., at South Chicago and Evanston, Ill., and at Mayville, Wis. It either directly or through ownership of stock in coal companies owns five bituminous coal mines, located in Pennsylvania, Ohio, and West Virginia. It owns 1,334 private coal cars, which are used in transportation of coal from its mines to its steel plants. Its manufacturing conditions and necessities for a constant, uniform, and fresh supply of selected metallurgical coal of known and unvarying chemical and physical properties are substantially similar to those in the case of Bethlehem Steel Company.

In No. 3275, the Rainey-Wood Coke Company, the Seaboard By-Product Company, the Chicago By-Product Company, and the Donner-Hanna Coke Corporation are corporations engaged in operating by-product coke ovens at respectively Swedeland, Pa., where 110 ovens and by-product recovery apparatus are operated; at Kearney, N. J., where 165 ovens and by-product recovery apparatus and water gas making apparatus are operated; at Chicago, Ill., where 105 ovens and by-product recovery apparatus in connection therewith and water gas making apparatus are operated; and at Buffalo, N. Y., where 150 ovens and by-product recovery apparatus are operated. These corporations require a constant supply of bituminous coal of uniform quality and character for the operations of their by-product coke ovens. Rainey-Wood Company owns 400 private cars, the Seaboard By-Product Company 1,000 cars, of which 650 are leased and operated by the Chicago By-Product Coke Company, and the Donner-Hanna Coke Corporation owns 500 such cars. There is invested in these cars the sum of $6,300,000, and they are used in the transportation of coal from bituminous mines to their plants.

These companies by modern processes save and preserve the by-products of coal, invaluable in industries, in public and domestic use, and in the sciences of chemistry and medicine, by carbonizing bituminous coal, directly producing thereby coke, gas, tar, and sulphate of ammonia. Their coke is sold for metallurgical use in blast furnaces in competition with coke made in the beehive ovens, in which the by-products are wasted, for making water gas by public service corporations, which distribute it to the public. The coke so used must be of quality and structure to produce gas of standard quality and heat value contents. It is sold for industrial purposes in making steam, for domestic purposes, in the heating of houses, apartments, and other buildings. The coke supplied for making water gas is furnished to public service companies supplying the cities of Philadelphia, New York, Brooklyn, and Chicago, and to many other cities and towns and nearby territory.

The gas produced as a by-product is used for the operation of the plaintiff's plants and the balance is sold to companies serving municipalities and suburban sections near Philadelphia, Chicago, and Buffalo, and their adjacent districts, and in northern and central New Jersey. The public gas companies manufacturing their own gas, and those supplied with gas are dependent at all times upon the supply of coke and gas received to enable them to perform their public obligations and to maintain adequate and efficient public service. The tar produced in the plaintiffs' plants is sold for use in the chemical, drug, dye, photographic, building and road material, and other industries. Sulphate of ammonia is used in the manufacture of commercial fertilizers. The light oils produced are refined to produce benzol for motor fuel, and, in times of war, toluol and other materials of which essential high explosives are made. It will be seen that, as a fundamental and essential requirement for the conduct of the operations of these companies, it is essential to have, as in the Bethlehem case, an even and continuous supply of bituminous coal of selected and known quality. Their private coal cars are therefore used for transportation of coal from mines, selected with reference to convenience of delivery and quality of coal produced, to their respective plants.

The Public Service Gas & Electric Company, the plaintiff in No. 3317, is engaged in the business of generating, manufacturing, and distributing electricity and gas for light, heat, and power for public use. It has distributing systems in 231 municipalities in the state of New Jersey, with a population of approximately 2,600,000. It supplies electric current, for lighting dwellings and other private buildings, public buildings and public highways, and heat and power for manufacturing purposes. Its customers using electricity number 525,000. It manufactures and distributes gas for light, heat, and power for domestic, commercial, and manufacturing uses. Its gas customers number 643,000, and its business is rapidly increasing. It uses daily 2,800 tons of bituminous coal for generating elec-

tricity and 890 tons for the manufacture of gas. Its generating stations are located in New Jersey, where there are no coal mines. It obtains its coal supply from mines in Pennsylvania, taking the entire output of two mines. In September, 1920, it purchased 600 coal cars, at a cost of $1,750,000, to carry its coal from the mines to its generating and manufacturing station, being impelled to do so by reason of its inability to obtain a regular and constant fuel supply of the proper quality and grade during coal car shortages, except through priority orders induced by reason of the necessities of its business in serving the public. Prior to purchasing the cars, Mr. Farrand, assistant to the president, laid the situation before Commissioner Aitchison of the Interstate Commerce Commission, and was referred by him to the ruling in the Hillsdale Coal Case, 19 Interst. Com. Com'n R. 356, as ground for assurance that owners of private cars are entitled to their exclusive use so long as such cars are counted against the distributive share of the mines to which assigned. The mines from which the plaintiff receives its coal are under 10-year contracts for the output of the mines, aggregating 1,000,000 tons a year. It is the purchaser of 25,000,000 cubic feet of gas a day from the Seaboard By-Product Coke Company.

In suit No. 3271, the plaintiffs are owners and operators of bituminous coal mines. The mines of Berwind-White are in Clearfield, Cambria, and Somerset counties, Pa. It owns 3,036 private coal cars of the value of approximately $6,000,000. The mines of the Westmoreland Coal Company are located in Westmoreland county, Pa. It owns 2,012 private coal cars of a value of approximately $4,000,000. The mines of the New River & Pocahontas Consolidated Coal Company are located in Fayette and McDowell counties, W. Va. It owns 1,000 private coal cars, of a value of approximately $2,000,000. The mines of the Pennsylvania Coal & Coke Corporation are located in Cambria, Clearfield, Indiana, and Blair counties, Pa. It owns 1,000 private coal cars, of a value of approximately $2,000,000.

A large part of these coal companies' production of bituminous coal is contracted for and delivered annually to public utilities and other public use consumers. As to all of the complainants in the several bills, it is a stipulated fact that the several common carriers, over whose lines the privately owned coal cars of the plaintiffs move, are and have been willing to handle them.

In all of the suits, the Central Pennsylvania Coal Producers' Association, a voluntary unincorporated association of coal operators who produce coal in the central Pennsylvania district, the Empire Coal & Coke Company, engaged in the business of mining and shipping coal in West Virginia, Pocahontas Fuel Company, Inc., engaged in the business of mining and shipping coal in the states of West Virginia and Virginia, and the Pocahontas Operators Association, composed of numerous corporations engaged in the business of mining and shipping coal in Virginia or West Virginia, were upon petition allowed to intervene as parties defendant. The members of the Central Pennsylvania Coal Producers' Association produce approximately 30,000,000 tons of bituminous coal annually, a large proportion of which moves in interstate commerce.

The Commission in its investigation heard testimony and arguments on the part of such individuals, corporations, and voluntary organizations as desired to be heard, affecting their interests, including the associations of bituminous coal mine operators who have intervened in the present suit as parties defendant, representatives of organized labor in the bituminous coal industry, the railroads which were made respondents in the investigation, and, when the case was reopened, private car owners, who claimed to be affected by the result of the controversy, including the parties to the bills filed and the intervening parties.

At the hearing in the present suit, the entire record before the Commission was offered in evidence on behalf of all the plaintiffs, except the railroads, whose counsel base their case entirely upon the reports and orders of the Commission and testimony tending to show the manner in which the railroads, in view of their necessity to have and maintain a continuous and sufficient supply of proper bituminous coal for their operations as common carriers, are affected by the order.

The Commission bases its order upon the legal conclusion that the assigned car rule, as practiced by the railroads, is an unjust and unreasonable regulation and practice prohibited by paragraphs (3), (6), (10), (11), and (12) of section 1 of the Interstate Commerce Act, added to that section by the Transportation Act of 1920 (Comp. St. Ann. Supp. 1923, § 8563), and discriminatory as giving to the mines receiving assigned cars an undue and unreasonable preference and advantage over other mines, prohibited by section 3 (section 8565), and that

the discontinuance of the rule is within the power of the Commission under section 1, paragraph (14), and section 15 (section 8583); that it has power to determine what is a just and reasonable rule of distribution of cars among the coal mine served by any carrier by railroad prescribed by paragraph (12) of section 1, also added by the amendment of 1920.

The contentions of the several plaintiffs are: That the order of the Commission is beyond the scope of authority conferred upon the Commission by Congress and the result of an erroneous conception by the Commission of its powers. That while, in form, it purports to prescribe regulations for the distribution of coal cars in time of car shortage, it is, in substance and intent, an attempt to regulate the mining industry, through distributing coal production ratably among all mines desiring to operate, in order to equalize working time and costs of mine production among all such mines, by preventing the plaintiffs and others, through the use of railroad fuel cars or private cars, from securing their coal either by ownership of mines or by contract where they desire. That the effect of the order will deprive the railroads of the benefit of such private car equipment as may not, under the order, be placed at mines by their owners. That it denies to the plaintiffs the right existing at common law and preserved in the Interstate Commerce Act and recognized by Congress to own and use private cars. That it will deprive the plaintiffs of the value of their cars and of their right to have them used and operated in time of coal car shortage without compensation, and therefore is in violation of the Fifth Amendment to the Constitution. That, as to the by-product coke companies and the coal companies, the order is unjust and unreasonable and discriminatory against them, in that their competitors in the fuel oil and anthracite coal industries are not within the terms of the order, resulting in undue prejudice to the plaintiffs, and undue preference and advantage of the plaintiff's competitors. As to all of the plaintiffs, excepting the railroads, that the findings of the unjustness and unreasonableness of the assigned car rule and of discriminatory preference and advantage of the plaintiffs are unsupported by the evidence.

It is contended on the part of the Public Service Electric & Gas Company that it is a denial of its right under the laws of Pennsylvania and New Jersey to have its private coal cars transported by the Pennsylvania Railroad, and other railroads subject to the said laws, which right is preserved by the Interstate Commerce Act and the Constitution of the United States. The plaintiffs, therefore, contend that the order of the Interstate Commerce Commission is unjust, unreasonable, arbitrary, and unlawful.

Those contentions are all traversed by the answers. Before discussing the questions in issue, we will state the established rules as to the extent of the power of the court, so far as applicable here, upon the review of an order of the Interstate Commerce Commission.

[1, 2] It has been settled that the orders of the Commission are final, unless beyond the power which it could constitutionally exercise, or beyond its statutory power, or based upon a mistake of law. But questions of fact may be involved in the determination of questions of law, so that an order, regular on its face, may be set aside if, upon the facts found, it is confiscatory and in violation of the constitutional prohibition against taking property without due process of law, or the authority therein involved has been exercised in such an unreasonable manner as to cause it to be within the elementary rule that the substance and not the shadow determines the validity of the exercise of the power.

[3, 4] In determining these mixed questions of law and fact, the court confines itself to the ultimate question as to whether the Commission acted within its power. It will not consider the expediency or wisdom of the order, or whether, on like testimony, it would have made a similar ruling. The findings of the Commission are made by law prima facie true, and the courts have ascribed to them the strength due to the judgment of a tribunal appointed by law and informed by experience. Its conclusion is subject to review, but, when supported by evidence, is accepted as final. But the courts will not examine the facts further than to determine whether there is substantial evidence to sustain the order. Interst. Com. Com'n v. Union Pac. R. R., 222 U. S. 541, 32 S. Ct. 108, 56 L. Ed. 308; Intermountain Rate Cases, 234 U. S. 476, 34 S. Ct. 986, 58 L. Ed. 1408; Interst. Com. Com'n v. Ill. Cent. R. R., 215 U. S. 452, 30 S. Ct. 155, 54 L. Ed. 280; United States v. New River Co., 265 U. S. 533, 44 S. Ct. 610, 68 L. Ed. 1165.

The duties of the carriers, in relation to car distribution, are imposed by section 1 of the Interstate Commerce Act. Paragraph

(6) makes it their duty to establish, observe, and enforce just and reasonable regulations and practices affecting the facilities for "transportation," which term under paragraph (3) includes cars irrespective of ownership or of any contract express or implied for the use thereof.

Paragraph (10) defines "car service" as including the use, control, supply, movement, distribution, exchange, interchange, and return of cars and other vehicles used in the transportation of property. Paragraph (11) makes it the duty of the carrier to furnish safe and adequate car service and to enforce just and reasonable rules, regulations, and practices with respect to car service.

Paragraph (12) provides: "It shall also be the duty of every carrier by railroad to make just and reasonable distribution of cars for transportation of coal among the coal mines served by it, whether located upon its line or lines or customarily dependent upon it for car supply. During any period when the supply of cars available for such service does not equal the requirements of such mines it shall be the duty of the carrier to maintain and apply just and reasonable ratings of such mines and to count each and every car furnished to or used by any such mine for transportation of coal against the mine. Failure or refusal so to do shall be unlawful, and in respect of each car not so counted shall be deemed a separate offense, and the carrier, receiver, or operating trustee so failing or refusing shall forfeit to the United States the sum of $100 for each offense, which may be recovered in a civil action brought by the United States."

Paragraph (14) empowers the Commission, after hearing upon complaint, or upon its own initiative without complaint, to establish reasonable rules, regulations, and practices with respect to car service, including the compensation to be paid for the use of any car or other vehicle not owned by the carrier using it.

Section 3 (1) forbids undue or unreasonable preference or advantage to any particular person or description of traffic or subjecting any particular person or description of traffic to any undue or unreasonable prejudice or disadvantage. The powers vested in the Commission concerning the prohibitions against unreasonable or discriminatory acts on the part of the carriers are contained in section 15 (1). Under that section, the Commission, if it shall be of the opinion that any regulation or practice of the carrier subject to the provisions of

the act is or will be unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial, may determine and prescribe what regulation or practice is or will be just, fair, and reasonable to be thereafter followed.

The effect of the order upon the plaintiffs will be considered before examining the grounds upon which the Commission bases its conclusion that the assigned car rule is unjust and unreasonable in that it is unjustly discriminatory or unduly preferential or prejudicial. It is conceded by all parties that the order abolishes the assigned car rule absolutely. It is also conceded that, during periods of abundant car supply, the assignment of railroad fuel cars or private cars is of no great importance to the railroads or the owners of private cars.

We have seen that, in order that the public service corporations, the steel manufacturing companies, and the by-product coke companies may successfully maintain production through the operation of their plants, and the coal companies may maintain a regular supply of fuel for public and private use, they must, by keeping their mines in operation, be able to ship a constantly sufficient quantity of coal of selected kinds and quality for their needs. In order to overcome the difficulties arising from an irregular uncertain coal supply in times of railroad car shortage, therefore, the plaintiffs have laid out large sums of money in supplying themselves with private cars in order that they may be assigned to mines owned or leased by them or with which they have contracts for total or partial output without being dependent upon the available supply of system cars to be prorated among the mines, and the effect of the order of the Commission is to deprive them of the use of these cars, in the time of coal car shortage, in numbers in excess of the pro rata distributive share of system cars available for distribution.

To illustrate: We will assume that in a given mining district a group of mines served by system or railroad owned cars has aggregate ratings of 500 cars and that a mine served by private cars has a rating of 100 cars; that the number of cars available including private cars is such that 50 per cent. distribution prevails, but there are present 100 private cars. In that case, only 50 private cars can be placed for loading and moving; the other 50 private cars must either stand idle on the sidings or will be appropriated for the use of others than their owners.

The same situation will result as to the fuel cars of the railroads, and, in each case, notwithstanding the fact that during such coal car shortage there may be no corresponding shortage of other railroad facilities, such as track, motive power, and labor. This is so because, during car shortage, the order is to be universally applied, whether or not the railroad system has ample facilities for movement of the cars, and whether or not such facilities are, by reason of the order, excluded from service through which the railroad company could be carrying on its operations and earning freight.

[5] The right to the use of private cars is clearly recognized by the law. That is apparent in various sections of the Interstate Commerce Act. They are included in paragraph (3) of section 1 as instrumentalities of shipment or carriage; in paragraph (12) in the requirement that the carrier, in times of car shortage, shall count each and every car furnished to or used by any mine for transportation of coal against the mine; in paragraph (14) as cars not owned by the carrier·using them; and in paragraph (15) their use is excluded from the power conferred by Congress upon the Commission to make directions with respect to car service, by confining its power in making such directions, to car service without regard to the ownership of cars as between carriers; also by paragraph (13) of section 15, which recognizes the right of the shipper to furnish its own instrumentalities of transportation and to receive just and reasonable compensation therefor.

This right of private car use and ownership is recognized by the Commission. In Exhibit G (Assigned Cars for Bituminous Coal Mines, 93 Interst. Com. Com'n R. 701), at page 278, the Commission says:

"The Congress has thus recognized the use of the privately owned cars and has limited our power to touch that right to our power over the carriers. We cannot declare that right unreasonable or unjustly discriminatory, or unduly prejudicial or unlawful because of something that is inherent in the nature of that right, because by so doing, we would be abrogating a right which the Congress has recognized and which we have stated could only be abrogated by appropriate legislation."

And in Exhibit E (Assigned Cars for Bituminous Coal Mines, 80 Interst. Com. Com'n R. 520), at page 96, they say:

"The use of private cars by railroad carriers has been recognized by Congress, which has provided for the control of the use of such equipment by us, under the provisions of the Interstate Commerce Act by means of a mandate addressed to the carriers subject to our jurisdiction. We do not deal with the private car owner as such."

It is recognized by the courts. See Ellis v. Interst. Com. Com'n, 237 U. S. 434, 35 S. Ct. 645, 59 L. Ed. 1036.

This valuable legal right in the ownership of private cars, in which sums of money amounting to millions of dollars have been invested by the plaintiffs, furnishes the only means by which the car owners can procure an adequate fuel supply in periods of recurrent car shortage. Except during such periods, the private cars are of no value, for the owner's compensation for their use, fixed by the Commission under section 1 (14), is but 1½ cents per mile, which, it is found, does not pay the cost of their maintenance and repair. The Commission, having no power delegated by Congress over the private car owner, has, by its order, through its power over the carriers, abolished the use of private coal cars, except subject to the pro rata distribution prescribed, for the only practical purpose to which they may be put, and has thereby deprived the private car owners of the full use and enjoyment of their rights to operate their mines, and of their full rights under their contracts to supply themselves with coal from other mines. There is an undoubted purpose appearing throughout the Commission's report to accomplish the ultimate result of entirely abolishing the use of the private coal car, unless, indeed, it is intended by the Commission, in the application of its order to the car service rules of the railroads, to require their distribution among the commercial lines, as part of the available equipment of the railroads. That subject will be discussed elsewhere.

The obvious and conceded effect upon the railroads, in times of coal car shortage, will be that no railroad fuel may be transported from the mines operated for the production and shipment of railroad fuel in excess of the capacity of the cars allotted under the pro rata distribution. The primary object of a railroad company is to operate its railroad. The primary need is fuel for its locomotives. That self-evident fact is well and tersely stated in the brief for the railroads thus:

"Locomotive fuel coal is burned for just one purpose—to give the public regular and ample freight and passenger transportation service. If the fuel supply fails, the service fails; if the fuel supply deteriorates, the

service deteriorates. The connection and result are immediate."

And by the Commission in its first report thus:

"Certain premises meet general acceptance in this record. It is recognized that the importance of the railroads in the distribution of coal and other commodities, and their general dependence upon bituminous coal in producing transportation, require that in some lawful way they may be assured of a steady supply of suitable coal. It is likewise generally admitted that, whatever means are adopted to secure such supply, emergencies will occur when the supply will fail' unless the railroad is enabled by some means within the law to take sufficient coal ahead of less necessitous uses to keep the flow of traffic going as the public interest requires."

That the fuel supply of the railroads will be seriously curtailed and insufficient for their legitimate needs in operating their railroads, unless they entirely change their methods of procuring coal, cannot be doubted as a necessary consequence of the enforcement of the Commission's order, for it nowhere appears that, under the assigned car rule, they have obtained more than sufficient supply for their needs. The necessity of a departure from their present methods through ownership or lease of mines, or entire or partial output contracts is conceded in the Commission's reports. The Commission, in order to meet that necessity, approves of the suggestion by the complaining coal operators of the following courses for avoidance of shortage of fuel during car shortage in order to overcome the consequences of the railroads, having to abandon their present methods of obtaining their fuel supply:

(1) By storing more substantial amounts of fuel coal at points of consumption during periods of inactive demands upon the part of the public which, it is claimed, can be done without undue expense.

(2) By a wider distribution of fuel contracts among producing mines.

(3) By contracting that a certain proportion of the coal produced and to be shipped shall be carded for railroad use before deferred customers are supplied.

And (4) by order of this Commission suspending the applicable rules as to equal distribution in the special cases of real emergency under the powers conferred by paragraph (15) of section 1 of the act.

It is apparent therefore that it is the conclusion of the Commission that the abolishment of the assigned car rule will compel the railroads to adopt some other methods of procuring the coal necessary for railroad fuel. Methods (1), (2), and (3) suggested by the Commission involve subjects over which Congress has not invested the Commission with authority as an incident to its control of car distribution. It is not shown that the adoption of any of the suggested methods tends toward the efficient and economical management over which the Commission is given control under paragraph (2) of section 15a (Comp. St. Ann. Supp. 1923, § 8583a), and the authority there conferred is only in connection with the power to prescribe just and reasonable rates. And Congress has not otherwise invested the Commission with control over the expenditures of railroads except under the provisions of section 10 of the Clayton Act, 38 Stat. 730 (Comp. St. § 8835i), which has no relation to the matters in issue here.

In discussing the four methods of meeting the situation, the Commission says in its report: "Perhaps singly none of the suggested courses would be selected but in combination they would greatly mitigate the results which the respondents claim would follow the abolition of the assigned car privilege."

The effect upon the railroads, if either methods (1), (2), or (3) is adopted will be that they will be deprived of the use of their property in their mines, in the enjoyment of a free right to contract for their fuel supply, and of the right to continue the internal management of their business in accordance with their own judgment and discretion.

It is apparent either that by its order, through indirection, the Commission is assuming to deprive the owners of the use of their private cars and to regulate the railroads in matters over which it has no control, or that, if the order made is lawful and within the powers of the Commission, those results are necessary incidents, disadvantageous though their effect upon the plaintiffs' may be, to a lawful exercise of the Commission's power. The object to be accomplished by the order is the correction of conditions in the bituminous coal mining industry said to arise from the alleged unjust, unreasonable, and unduly discriminatory effect of the assigned car rule in giving an undue preference and advantage to the mines supplying coal for the railroads and private car owners through the use of assigned cars. As bituminous coal is ordinarily run direct from the mine tipple in-

to the railroad car, the operation of mines is affected whenever enough coal cars to meet all the demands are not immediately available at the mines.

It is shown in the case and found by the Commission that, as a general rule, mines not receiving assigned cars during shortage periods have been operated at greater cost and with more intermittent working time, and therefore with less steady employment for labor, than mines receiving assigned cars. As a result of the greater proportionate overhead cost to mines intermittently operated, the operators become discontented, and as a result of intermittent employment labor becomes discontented, and the better and more efficient mine workers are attracted to mines giving the steadier employment. The railroad fuel cars and private cars are provided for the purpose of keeping a constant and regular movement of coal supply, so that the mines to which they are assigned have the advantage over other mines not so provided, and the Commission states regarding the assigned car rule: "It produces great and harmful inequalities in working time in nearby competing mines," meaning, of course, as between those receiving and those not receiving assigned cars.

Another factor found by the Commission and conceded by all parties is that the bituminous coal mining industry is highly overdeveloped. The Commission says: "There is enough bituminous coal in the ground in this country to more than supply the demands of all consumers for a long period. There are more than enough miners to produce coal for all purposes. There are more mines than is consistent with the most efficient use of equipment, and their aggregate capacity greatly exceeds the country's demand."

Moreover, the demands for coal are not constant. They are seasonal and, as a result, the Commission finds there are frequent seasonal or local car shortages. Commenting on the effect of the overdevelopment upon the car supply, the Commission finds:

"In times of plentiful car supply, or when the demand for bituminous coal is low, many small or weak mines, which are the least economical to operate, are forced to close. Car shortages are usually accompanied by a condition of alarm on the part of the consuming public, and a demand for the coal which becomes more excited as the coal car supply lessens. This encourages the opening of the smaller and weaker mines with the recurrence of a poor car supply, and the paradox is presented that as the car supply becomes worse, the capacity of the open mines increases at even a greater rate. This makes more difficult the process of distribution as the cars, in service cannot be handled as efficiently, nor can as much coal be transported in the aggregate as if fewer mines were demanding service. The increase in demand and mine rating must be met by a pro rata distribution of the available cars, and thus the supply, already diminished because of the lesser efficiency possible in movement, is further diluted in the process of ratable distribution according to the enlarged capacity."

The Commission further finds "that the orders by mines in times of [car] shortage, taken as the base to which each of the percentages stated apply, which approximate the mine ratings, are notoriously far greater than the normal mine capacities, or the ability of the carrier to transport or the country to consume bituminous coal, when taken in the aggregate."

During the period of coal shortage, when the productive capacity of the commercial mines is increased because of the unusual activity of mines that have not been active during the period of sufficient car supply, the mines receiving assigned cars are conceded to be able to operate on full time, as they have been doing during other times of abundant car supply. While the Commission finds that the operators are not unanimous in their opinion that the result of the assigned car practice has been detrimental to their industries, it does state as established that the general effect of the assigned car practice is to attract as many desirable miners as can be given employment to the assigned car mines and away from the commercial mines. Often these two classes of mines are located close to each other and the miners, paid upon a quantity basis in the commercial mines, are rendered discontented when they are compelled to remain idle a large part of the time during a car shortage while neighboring mines with assigned cars are operating on a substantially full time basis.

The Commission finds further: "The result of the inequality in the running time as between mines receiving assigned cars and those purely commercial is that the cost of operation of the latter must be higher for each unit of production and the amount of such increased cost is considerable and important. Mine production costs rise because of the diminished car supply."

The Commission also finds that the sup-

ply of cars at commercial mines would be increased by abolishing the assigned car rule. That conclusion is based upon tables showing that, if all the cars on certain railroads at certain periods, assigned and unassigned, had been distributed pro rata among all the mines in certain districts, the percentage distributed to the commercial mines would have been increased. Necessarily that conclusion assumes the right of the railroads to distribute not only railroad fuel cars but private cars to other mines than those shipping coal to their owners.

These, then, are the disadvantages and prejudices under which, in the view of the Commission, the shippers of coal from commercial mines are placed through the practice of the assigned car rule: The mines are operated at a higher cost than those served with assigned cars; they are subjected to labor troubles through the fact that the working time at their mines is more intermittent than at mines receiving assigned cars; and they receive a lower percentage of their rated capacity than they would if all cars were allotted pro rata.

It is also held by the Commission that the private car owners are preferentially treated in that they receive more than their fair share of the use of railroad facilities, such as locomotives, tracks, terminals, and labor, which they do not own. This because, under the assigned car rule, assigned cars may be placed at the mines in excess of the pro rata allotment to the mine, provided they are counted against the share of system car distribution to which the mine is then entitled. Such excess naturally causes the use of a greater proportion of the railroad's motive power, trackage, etc., than if the excess of cars was not placed and moved.

The Commission mentions as another factor of preference the fact that private cars, because they are usually operated in shuttle service, moving regularly between points of destination, and thus avoid the switching and spotting service necessary in commercial shipments, are likely to receive preferred treatment.

Although all of the coal-carrying railroads of the country were respondents in the proceedings before the Commission, and opportunity was afforded to all opponents of the assigned car rule to introduce evidence concerning preferences in the treatment of private car owners, the specific findings of the Commission in relation to such preferences are summarized as follows:

"The record indicates that during 1920 and the summer of 1922 certain carriers, particularly the Pennsylvania, Chesapeake & Ohio, and the Louisville & Nashville, accorded to private car owners a greater use of their facilities than they should properly receive. The extent to which this was done, however, is not clearly established of record. The conditions of the past year were abnormal. The carriers' locomotives, due to the shopmen's strike, were in poor condition. The strike in the bituminous coal fields made a heavy demand for coal from the nonunion fields, a large part of which are located upon the lines of the three carriers mentioned, and taxed the carriers' facilities. The termination of the coal strike increased the demand for coal, with a resulting greater burden upon the carriers' already overtaxed facilities. In the congestion when the carriers were unable to transport promptly all traffic offered them, certain of them did prefer the handling of private cars from motives of convenience."

It is further stated in the report:

"There are other practices of some of the carriers in the handling of private cars which are not free from criticism. We have in mind particularly the placement for the private car owner of its own cars at certain mines to be loaded with coal for the owner's use from day to day and the placement of system cars at the same mines on alternate days; if on the days on which such private cars are placed they exceed the pro rata share of cars to which that particular mine would be entitled if dependent wholly upon system cars, no subsequent adjustment of such overage is made. Any attempt on our part to mitigate the bad effects of such a practice is but temporizing. The private car owner is either entitled to the preference to the full extent of the carrier's willingness to accept his cars, or he is entitled to no preference whatsoever on account of that ownership, and a compromise is untenable."

Coming to the issues of law raised by the pleadings, it is contended by the plaintiffs that the Commission is without power to abolish the assigned car rule, because that rule, as embodied in the Hocking Valley-Traer rule, was enacted into statute by paragraph (12) of section 1 of the Interstate Commerce Act. The Commission holds that the paragraph does not, in terms, prohibit the practice of assigning cars for railway fuel and private cars to coal mines under the limitations fixed in the Hocking Valley and Traer Cases, but that the Commission has power under paragraph (14) of section 1 and section 15 to determine what is a just and reasonable distribution of cars

among the mines, and whether the practice under the assigned car rule of counting each and every car against the mine is just and reasonable, and, if found discriminatory, to require the railroads to abolish it as an unjust and discriminatory practice. The Commission concedes that the phrase "count against the mine," in paragraph (12), has been used by it as not inconsistent with the practice prescribed in the Hocking Valley and Traer Cases and in the Hillsdale Case, 19 Interst. Com. Com'n R. 356. The Supreme Court used the same phrase in the same sense in Interstate Commerce Commission v. Illinois Central Railroad, 215 U. S. 452, 30 S. Ct. 155, 54 L. Ed. 280.

When Congress had before it the Transportation Act of 1920, which carried with it an amendment to the Interstate Commerce Act which became paragraph (12) of section 1, the House Committee on interstate and foreign commerce had under consideration at the same time Senate Bill No. 3288 which, in addition to the requirement that the carriers make just, reasonable, and nondiscriminatory distribution among the mines of all cars available for the transportation of coal in times of coal shortage and the counting of each and every car against the proportionate distributive share of the mine, contained the following language: "And that no cars shall be furnished to or used by any mine for the transportation of coal during a car shortage period in excess of the proportionate distributive share of such mine."

The House committee called before it Commissioner Clark, chairman of the Interstate Commerce Commission, who fully apprised the committee of the fact that the railroad administration had adopted the car distribution rule laid down by the Commission in the Hocking Valley and Traer Cases, and had followed the practice of counting assigned cars against the distributive share of the mines in accordance with that rule. He stated to the committee that he thought that was the sound rule and the right rule; that it had stood the test of adjudication at the hands of the Commission and at the hands of the Supreme Court of the United States—and concluded: "So I cannot see any possible objection to carrying it into the statute."

In the report to the House of Representatives on the bill, which afterward became paragraph (12), the Committee, after explaining the provisions of the proposed statute, said: "Paragraph (12) of the amended section incorporates in the statute a rule laid down by the Commission and upheld by the Supreme Court as to just and reasonable distribution of coal cars among the mines, thus avoiding any possibility of the recurrence of the evil of what is known as the assigned car rule."

The Senate Bill and the House Bill went to conference, and the Senate Bill, prohibiting the furnishing or use, during coal car shortage, of cars in excess of the proportionate distributive share of the mine, was rejected, and the House Bill became the law. In the Commission's report to the Senate on June 11, 1920 (Assignment of Freight Cars), 57 Interst. Com. Com'n R. 760), it is stated:

The Commission is of opinion that paragraph (12) of section 1 of the Interstate Commerce Act does not change the rule of law laid down in the Hocking Valley and Traer Cases, supra. The paragraph states in statutory form that which had theretofore been the law pursuant to the decisions of the Commission and of the Supreme Court of the United States."

The legislative history of the bill and its construction by the Commission, without any action on the part of Congress to change it, is highly persuasive of the construction now urged by the plaintiffs, but rejected by the Commission in the present proceeding. We find it, however, unnecessary to base our conclusions in the case upon the construction of paragraph (12) of section 1, although its legislative history in connection with the administrative history of the assigned car rule has a bearing upon the question of the reasonableness of the order of the Commission which is before us.

[6,7] While the railroads are required to make just and reasonable distribution of cars, and reasonable rules and regulations, it is also contemplated and provided in the act, wherever power to make orders is conferred by Congress upon the Commission, that they shall be just and reasonable. Congress, however, has conferred broad administrative powers upon the Commission and the question as to what is a just and reasonable rule is an administrative question for the Commission to decide. Morrisdale v. Pennsylvania Railroad, 230 U. S. 304, 33 S. Ct. 938, 57 L. Ed. 1494; Cleveland & Western Coal Co. v. Baltimore & O. R. Co. (D. C.) 283 F. 995. Therefore, unless an order of the Commission is not within the powers conferred upon it by Congress, it is for the Commission, and not for the courts, to determine what is a just and reasonable rule. The Interstate Commerce Act should

be interpreted reasonably so as to accomplish its great purpose, to wit, to secure just and reasonable charges, to prohibit unjust discrimination, and to prevent undue and unreasonable preference. New Haven Railroad Co. v. Interst. Com. Com'n, 200 U. S. 361, 26 S. Ct. 272, 50 L. Ed. 515. But the discretion of the Commission in determining what is unjust and unreasonable must not be exercised so arbitrarily as to transcend the power conferred by Congress. U. S. v. New River Co., 265 U. S. 533, 44 S. Ct. 610, 68 L. Ed. 1165.

[8] The gist of the finding of the unreasonableness of the assigned car rule is that it is unjustly preferential and unduly discriminatory. But not every discrimination is illegal. Only that which is unjust and unreasonable. The law does not attempt to equalize fortunes, opportunities, or abilities. Interstate Commerce Com'n v. Diffenbaugh, 222 U. S. 42, 32 S. Ct. 22, 56 L. Ed. 83. And not every advantage that may inure to a shipper as the result of the position of his plant, his ownership, or his wealth, is a preference. Ellis v. Interstate Commerce Com'n, 237 U. S. 435, 35 S. Ct. 645, 59 L. Ed. 1036.

The Commission, in its report, sets forth its purpose, to give effect to the uniformity and equality of treatment which the act is intended to secure, citing Pennsylvania Railroad v. Stineman Coal Mining Co., 242 U. S. 298, 37 S. Ct. 118, 61 L. Ed. 316; to compel the carrier as a public agent to give equal terms to all; to cut up by the roots every form of discrimination, favoritism, and inequality, and to place all shippers upon equal terms, citing New Haven Railroad v. Interstate Commerce Com'n, 200 U. S. 361, 26 S. Ct. 272, 50 L. Ed. 515; Louisville & Nashville Railroad v. Mottley, 219 U. S. 467, 31 S. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671; United States v. Union Stockyard, 226 U. S. 286, 33 S. Ct. 83, 57 L. Ed. 226, and citing the Supreme Court's language in the Illinois Central Case as to the Commission's power to require "a just and equal distribution and the prevention of an unjust and discriminatory one" and to the reference by the court to the carriers' "duty to make equal distribution of cars" and "the duty of equality of treatment."

But if, in applying such terms to the situation here, the Commission has applied them without regard to the connection in which they were employed, and if the basic conception of the Commission is that the use by the railroads and the private car owners of all cars in excess of the general pro rata allotment is per se preferential, constituting an inequality in violation of the act and that, under the duty to enforce equality, what is meant is absolute equality, we think such conception is erroneous.

[9] The act does not require that all shippers shall be treated alike under any and all circumstances. In providing that car distribution shall be reasonable, that discriminations shall not be unjust and that preferences or advantages shall not be undue or unreasonable, it is not implied that strict uniformity and equality are to be enforced; but it is implied that all circumstances and conditions, which reasonable men would regard as affecting the welfare of the carrying companies and of producers, shippers, and consumers, should be considered by the tribunal appointed to carry into effect and enforce the provisions of the act. There must be a consideration of the question whether the transportation effected is under "substantially similar circumstances and conditions." Texas & Pacific Railway v. Interst. Com. Com'n, 162 U. S. 197, 16 S. Ct. 666, 40 L. Ed. 940.

In order to establish discrimination, the conditions as to service must be substantially alike. A., T. & S. Railroad v. D. & N. O. Railroad, 110 U. S. 667, 4 S. Ct. 185, 28 L. Ed. 291. But the Commission has determined that it is unlawfully discriminatory for the railroads, during car shortage, to transport the fuel necessary for their operations as carriers, and for owners of private cars to ship and transport coal in their private cars, in greater quantities than their pro rata allotments, in absolute numerical equality with shippers from mines neither shipping railway fuel nor owning private cars, and that any departure from this rule is preferential and discriminatory, notwithstanding conditions under which ample facilities are available for the purpose, and those facilities of transportation may be used without depriving the shippers from other mines of their use. So far as the latter are concerned, the use of locomotives, labor, tracks, and terminals in excess of what are sufficient to move their pro rata share of cars does not diminsh nor increase their means of transportation, but their demand, acceded to by the commission's order, is that, inasmuch as such facilities are of no advantage to them, their use by transportation of railway fuel and private cars be prohibited as preferential and discriminatory.

While, in the Illinois Central Case, it has been settled that the Commission has power to regulate the distribution of railway fuel cars and private cars in time of shortage to prevent discrimination, and that they may be taken into consideration as a basis for the capacity rating of mines and that the railroads may be required by the Commission to take them into account in order to prevent a preference of the mine to which such cars are assigned over other mines, yet there was nothing decided in that case adjudging as an unlawful discrimination the assignment of either class of cars in excess of the pro rata share of the mine, so long as they are counted against the distributive share of the mine. The finding of discrimination was based upon the fact that the mines served with assigned cars were under the rule then in effect, able to secure not only as many assigned cars as the facilities of the railroad permitted it to deliver, but in addition thereto, the same proportionate share of system cars as mines not receiving assigned cars. That practice resulted in a mine, already abundantly supplied with assigned cars, being further supplied with its full quota of system cars under the pro rata distribution then in effect, thereby diminishing the number of system cars distributable, and depriving the commercial mines of their percentage of that number of system cars. This was held unjust and unreasonable and unlawfully discriminatory. And the same discriminatory effect was present in the case of a joint mine in United States v. New River Co., 265 U. S. 533, 44 S. Ct. 610, 68 L. Ed. 1165.

The practices passed upon in those cases were essentially different from the practice under the assigned car rule which the Commission then held to be just and reasonable. Under the assigned car rule, the mines not receiving assigned cars are not deprived of any advantage pertaining to commerce enjoyed by the railroads or the private car owners which the commercial mines are not free also to have and enjoy. True, they may not have the financial resources to provide themselves with private cars, and they may not have the benefit of sales of railway fuel, but that is one of the conditions the act does not attempt to equalize. They are not, through the hauling of assigned cars, deprived of the use of any of the railroad facilities, unless there is, during car shortage, a shortage of other facilities. But the order is not conditioned upon such circumstance. It is to be universally applied under all circumstances. It is not free from doubt

that it is the conception of the Commission that the commercial mines are deprived of their rightful share of the cars devoted to carrying railway fuel, and of privately owned cars, and that the railroads, through the power of the Commission over them, in order to make more cars available for pro rata distribution, may be compelled, so far as their railway fuel is concerned, to adopt one of the methods approved by the Commission as a substitute for their present method of obtaining their supply through ownership of mines or through contracts with mines; and, so far as the private cars are concerned, the railroads may be required by the order of the Commission, to distribute the private cars among mines to which they are not assigned by their owners.

The primary duty of the railroads is to serve the public by transportation of freight and passengers and, in the transportation of coal, to carry it to its destination for consumption for public and private uses, and for distribution for the manufacture of other commodities supplied to the public. If the supply of fuel coal stops, the transportation over the railways must stop and the public generally deprived of its necessities.

But it is contended that the needs of the railroads for fuel can be adequately met by the order of the Commission suspending the applicable rules as to equal distribution in special cases of real emergency under the powers conferred by paragraph (15) of section 1 of the act. As heretofore stated, there is no finding anywhere in the report that the railroads have mined, or purchased under contract, and shipped greater quantities of fuel coal than has been necessary for the operation of their roads at any time during prior car shortages. By the order of the Commission, however, they are prohibited from using for their fuel necessities more cars during shortage periods than their distributive pro rata share with commercial mines. They may not find it to tend towards efficiency or economy to adopt any one of the other methods proposed for obtaining their fuel supply. Storage in large quantities may be impracticable and would appear of necessity to be more expensive than the present method of storage in the mine, as it would involve additional use of cars and locomotives to carry the coal from the mine to the point of storage and the cost of a second loading after the cars had been loaded at the tipple of the mine and transported and unloaded at the storage pile. The second

method would probably lead to demands on the part of the mines, among which their orders would be distributed, for excessive prices for coal, which, the Commission finds, obtain in time of car shortage; and the further probability should be considered that the necessary class and quality of fuel coal varies with different conditions of transportation. The same difficulties would be present, no doubt, in the suggestion of contracting for preferential deliveries by having coal carded at the mines; and it is not shown that preferential contracts would aid in any manner toward the desired result of increasing the available system cars for general distribution.

[10] We think it clear that the Commission has misconceived the purpose of paragraph (15) of section 1. It empowers the Commission to act when it is of opinion that shortage of equipment, congestion of traffic, or other emergency requiring immediate action exists. It is then empowered to suspend the operation of any or all rules, regulations or practice then established with respect to car service and to make just and reasonable directions with respect to car service without regard to ownership as between carriers. The clear intent of paragraph (15) is that it shall apply only in cases of emergency; that is, of unexpected conditions which may arise and which have not been sufficiently foreseen or long enough in effect to afford an opportunity to provide for them by action on the part of the carriers on their initiative or under the ordinary supervisory direction of the Commission. The emergency power is not given to the Commission to provide for conditions which are anticipated as the necessary result of standing orders prescribed in accordance with the other paragraphs of the act and thus to add to the ordinary power exercised by standing orders. Moreover, the emergency orders of the Commission must be just and reasonable, yet it is the apparent intention of the Commission to decide in advance that it will, under its emergency power, substitute for what it now finds to be a just and reasonable order, emergency orders putting into effect in whole or part the rule which it is now condemning as unjust, unreasonable, and discriminatory.

[11] While the Commission has power, in case of necessity to establish priority orders for the delivery of railroad fuel, it has not had conferred upon it the power to determine for the railroads the business methods and practices by which they may in the ordinary conduct of their business provide themselves with fuel. The mining of coal is not commerce. Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; United Mine Workers v. Coronado Coal Co., 259 U. S. 344, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762. While company fuel cars are instrumentalities of commerce and subjects of control in administering the act (Interstate Commerce Com'n v. Illinois Central Railroad, supra), and control of their use may incidentally in a proper case require the carriers to change their methods of obtaining fuel as an incident of lawful control, that effect of the Commission's order, when considered in connection with the ground upon which the order is based, leads to the conclusion that, unless cogent necessity appears for that effect, the control by indirection which causes it is exercised in an arbitrary and not a just and reasonable manner.

[12] It may not be seriously contemplated that the Commission's order requires the railroads to distribute the surplusage of private cars in time of shortage among shippers who are not their owners, yet the tabulation hereinbefore referred to, upon which it bases its finding that the abolishment of assigned cars would increase the distributive shares of all mines, and contentions that private cars are "leased" to, and part of the equipment of, the railroads, justifies an inference of a claim to power to so dispose of private cars. So far as it appears, the only arrangement between the private car owners and the railroads is that the cars shall be placed at the mines to which assigned, and the railroads compensate their owners for their use at a rate fixed by the Commission. We have seen that the right to the use of the privately owned car is recognized by Congress. It is recognized in the reports before us and in prior reports of the Commission as a right which Congress alone may abolish, Ruttle v. Pere Marquette Railroad Co., 13 Interst. Com. Com'n R. 179; In re Private Cars, 50 Interst. Com. Com'n R. 652; and Hillsdale Coal & Coke Co. v. Pennsylvania Railroad Co., 19 Interst. Com. Com'n R. 356; and in the decisions of the state and federal courts, Logan Coal Co. v. Pennsylvania Railroad Co. (C. C.) 154 F. 497; United States v. B. & O. Railroad Co. (C. C.) 154 F. 108; United States v. Baltimore & O. R. Co., 165 F. 113, 91 C. C. A. 147; Baltimore & O. R. Co. v. United States ex rel. Pitcairn Coal Co., 215 U. S. 481, 30 S. Ct. 164,

54 L. Ed. 292; Boyle v. P. & R. Railroad Co., 54 Pa. 310.

Private cars are in use generally upon the railroads for transporting not only coal, but oil, grain, flour, meat, fruits, vegetables, and numerous other commodities. While the Commission has power to regulate their use for their owner's purposes by a lawful order, their distribution to other shippers in order to bring about a greater pro rata allotment would be confiscatory and beyond the power conferred by Congress, and the theory of an increase pro rata allotment is therefore untenable.

The universality of the order is such that it entirely ignores all conditions except by comparison of mines served with private cars with commercial mines, showing inequalities in time of coal car shortage in costs of operation, and, through intermittent operation, in difficulties in affording constant employment to mine workers, thereby causing unequal conditions in mine labor. So that, even though the railways are abundantly able through sufficient motive power, track and terminal facilities, and employees to handle all the coal to be carried for fuel or upon private cars, they are forbidden to do so and the cars must remain idle. It appears only necessary to state this result to demonstrate its unreasonableness. For the order and the report of the Commission entirely leave out of consideration, in applying what is intended as a just and reasonable rule, the existence of widely varying conditions, viewing them as if constant and uniform. The order applies to all the railroads of the country extending over a wide expanse of territory and embracing an infinite variety of conditions. It applies to all divisions of all rail carriers in the United States, and at all times when need for allotment arises; to every case, wholly regardless of differentiating conditions.

If the discrimination found by the Commission is based upon the disadvantages to the commercial mines through the use and enjoyment by the railroads and private car owners of assigned cars in excess of the general distributive shares of their mines, the Commission has plainly exceeded its power in an attempt to regulate the bituminous coal mining industry. The Commission finds that that industry is highly overdeveloped; that many commercial mines do not operate at all, except during periods of car shortage, and then the rating of commercial mines is highly increased over their normal rating. Whether the conditions of disadvantage are the result of the railroads

continuing during car shortage to obtain their normal supply of fuel, and the private car owners to have their cars placed in normal numbers for the purpose for which they were acquired, or whether they are caused by the overdevelopment of the industry, such conditions, while a matter of public interest and of concern to the Interstate Commerce Commission, are not within the power of the Commission to control, except as incidental to the exercise of power in correcting discriminatory and preferential practices by the railroads.

[13] As our conclusion is that the practice under the assigned car rule is not per se preferential or discriminatory, the question remains whether the report justifies the conclusion that the right to their use has been exercised by the railroads in such a discriminatory and preferential manner as to justify the conclusion, it must be abolished in toto in order to eradicate discriminatory practices and preferences. In examining the several charges of preference and discrimination, we do not find that that conclusion has support, in view of the universality of the order. That the owners of private cars enjoy the use of a disproportionately large part of the facilities of the carrier, is not discriminatory unless other shippers are thereby deprived of the use of those facilities, and that is not the case unless there is a shortage of such facilities. That they move in train lots, in shuttle service, is an incident flowing from their movement between mines and the fixed locations of their owners' plants or yards, and no evidence was before the Commission, nor finding made, that, by reason of that incident to their operation, they have received preferential treatment.

If, as found by the Commission, private cars are placed at certain mines to be loaded from day to day and system cars are placed at the same mines on alternate days, and if, in case the number of private cars exceeds the pro rata share to which that mine would be entitled if dependent wholly upon system cars, no subsequent adjustment of such overage is made, the power to abolish their use does not follow, for Congress has not included the power, under cover of regulation, to abolish what it has sanctioned.

While the Commission finds that, on three railroads mentioned in the report, private car mines during car shortage in 1922 received practically a full car supply, while other mines on the same division of the same railroads received a comparatively small percentage of the cars ordered, it is not found

that this was the result of any undue preference of private cars but was caused by abnormal conditions, particularly the strike of the railroad shopmen and the bituminous coal miners.

[14] We find frequent expressions in the report of the Commission to the effect that, because of the assigned car rule, discrimination or preference may result, but findings of actual discrimination and preference, granting that they are sufficiently established to justify orders of the Commission prohibiting the carriers from pursuing such practices, are not sufficiently general in their scope nor substantial in their results to support the sweeping order of the Commission. An order based upon discrimination must be restricted in its scope to the discrimination actually shown. Interst. Com. Com'n v. Diffenbaugh, supra. Central Railroad of New Jersey v. United States, 257 U. S. 247, 42 S. Ct. 80, 66 L. Ed. 217; Wisconsin Rate Cases, 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; New York v. United States, 257 U. S. 591, 42 S. Ct. 239, 66 L. Ed. 385; American Express Co. v. Caldwell, 244 U. S. 617, 37 S. Ct. 656, 61 L. Ed. 1352.

We find no substantial foundation of preference and discrimination upon which to base the universal scope of the order. Through its operation, the railroads will be deprived of the use of their mines and of their right to exercise their judgment in procuring their coal supply, and the other plaintiffs of the use of their mines and their private cars.

[15] Private property cannot be taken for public use without just compensation, and cannot be taken for private use with or without compensation. The owners of private cars have acquired valuable property rights in order to carry on vast industries, serving the public with its necessities, in reliance upon the assigned car rule, and, as the order in question necessarily makes no provision for compensating the owners for the deprivation of their property, it is manifest that its effect is the taking of property without compensation, and in violation of the Fifth Amendment to the Constitution.

[16] We conclude that the order of the Commission is unjust and unreasonable and an unlawfully arbitrary exercise of power; that it undertakes by indirection to regulate the soft coal industry in matters which do not constitute transportation service relating to commerce and are not within the regulatory power of the Commission; that it assumes without authority of law to restrict the lawful right of the railroads to obtain by purchase or ownership of mines the supplies necessary to their operation in the service of the public; that the use of the railway fuel cars and private cars under the assigned car rule is not per se preferential; that there are no sufficient facts set out in the Commission's report upon which to base findings of such discriminatory and preferential practices as to justify an order of universal application such as has been entered in this case; that it is confiscatory in violation of the Fifth Amendment of the Constitution in depriving the railroads of the use of their mines and the private car owners of the use of their mines and cars; that the order is therefore beyond the authority of the Commission, without warrant of law, and null and void.

Decrees will therefore be entered, setting aside, annulling, and suspending the order and enjoining its enforcement. Counsel may prepare and present decrees in accordance herewith.