215 U.S. 452 (1910)
INTERSTATE COMMERCE COMMISSION
v.
ILLINOIS CENTRAL RAILROAD COMPANY.
No. 233.
Supreme Court of United States.
Argued October 15, 1909.
Decided January 10, 1910.
APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.
*453 Mr. Wade H. Ellis, Assistant to the Attorney General, and
Mr. Luther M. Walter, Special Assistant to the Attorney General, with whom Mr. L.A. Shaver and Mr. H.B. Arnold were on the brief, for appellant.
Mr. Eldon J. Cassoday, and Mr. Rush C. Butler for Receivers of the Illinois Collieries Company submitted a brief by leave of the court.
Mr. W.S. Kenyon and Mr. Garrard B. Winston, with whom Mr. Robert Mather, Mr. F.S. Winston and Mr. J.M. Dickinson were on the brief, for appellees.
*459 MR. JUSTICE WHITE delivered the opinion of the court.
Whether a duty rested upon the Illinois Central Railroad Company to obey an order made by the Interstate Commerce Commission is the question here to be decided.
On the ground that preferences were created and discriminations engendered by regulations established by the railroad company concerning the daily distribution of coal cars to mines along its line in periods when the supply of such cars was inadequate to meet the demand upon it for the movement of coal, the order in question commanded the railroad company to desist from enforcing the regulations found to be preferential, and for a future period of two years to deliver *460 cars to mines along its line in conformity with the rule announced by the commission.
A clearer perception of the questions to be considered will be afforded by giving a brief statement of the cause of car shortage referred to, accompanied with a mere outline of the steps generally taken by carriers to deal with the subject and the particular method applied by the Illinois Central Railroad Company prior to the date when the complaint was made against it, concerning which the order previously referred to was entered.
It is conceded in argument that bituminous coal mines, which are the character of mines here involved, must dispose of their product as soon as the coal is delivered at the surface, as it is not practicable for an operator to store such coal, and the amount that a mine will produce is therefore directly dependent upon the quantity that can be taken away day by day. As a result of this situation it is also conceded that railroads upon whose lines coal mines are situated pursue a system by which daily deliveries of cars, based upon requisitions of the respective mines, are made to such mines to permit of the removal of their available output for that day.
Notwithstanding full performance by railway carriers of the duty to have a legally sufficient supply of coal cars, it is conceded that unforeseen periods arise when a shortage of such cars to meet the demand for the transportation of coal takes place, because, among other things, a, of the wide fluctuation between the demands for the transportation of bituminous coal at different and uncertain periods; b, the large number of loaded coal cars delivered by a carrier beyond its own line for transportation over other roads consequent upon the fact that the coal produced at a particular point is normally distributed for consumption over an extensive area; and, c, because the cars thus parted with are subject to longer detentions than usually obtain in the case of shipments of other articles, owing to the fact that bituminous coal is often shipped by mining operators to distant points to be sold after *461 arrival, and is hence held at the terminal points awaiting sale, or because, owing to the cost of handling coal, and the difficulty of storing such coal, the car in which it is shipped is often used by the shipper or purchaser at the terminal points as a convenient means of storage or as an instrument for delivery, without the expense of breaking bulk, to other and distant points.
It is disclosed that the railroads of the United States generally, at various times, put in force regulations for the distribution of coal cars. Generally speaking, these regulations provide for fixing the capacity of coal mines in order to determine the number of cars to which each might normally be entitled to daily move its output of coal. And these regulations also provide for a method of determining the pro rata share of the cars daily allotted for distribution in times of car shortage. Neither the method by which capacity was to be ascertained nor the regulation for daily distribution upon the basis of such capacity in case of shortage was identical among the various railroad systems of the United States. The divergence, and even conflict, between those systems is illustrated by the cases of Logan Coal Co. v. Pennsylvania R.R. Co., 154 Fed. Rep. 497; United States ex rel. Pitcairn Coal Co. v. B. & O.R.R. Co., 165 Fed. Rep. 113; cases cited at pages 503 and 504 of the report of the Logan Coal Co. case, and the case of Majestic Coal & Coke Co. v. Illinois Central R.R. Co., 162 Fed. Rep. 810.
In a general sense, however, all the regulations of the various railroads, either for ascertaining the capacity of coal mines or in order to determine the pro rata share for daily distribution of cars to the respective mines in case of shortage dealt with four classes of cars: 1, system cars, that is, cars owned by the carrier and in use for the transportation of coal; 2, company fuel cars, that is, cars belonging to the company and used by it when necessary for the movement of coal from the mines on its own line, and which coal had been bought by the carrier and was used solely for its own fuel purposes; 3, private cars, that is, cars either owned by coal mining companies or shippers or *462 consumers, and used for the benefit of their owners in conveying coal from the mines to designated points of delivery; 4, foreign railway fuel cars, that is, cars owned by other railroad companies and which were by them delivered to the carriers on whose lines mines were situated, for the purpose of enabling the cars to be loaded with coal and returned to the company by whom the cars had been furnished, the coal being intended for use as fuel by such foreign railroad companies.
The various regulations, irrespective of minor differences between them, fell upon one or the other side of this broad line of division. One system took into account class 2, the fuel cars of the carrier, class 3, the private cars, and class 4, the cars of foreign railroads, and deducted from the rated capacity of the mine the sum of coal delivered by that mine in such cars, and upon the basis thus resulting apportioned ratably in case of shortage the system cars, that is, those embraced in class 1. On the other hand the other class of regulation not only took no account of the cars in classes 2, 3 and 4, as a means of rating the capacity of the mine, but moreover did not charge against any mine, for the purpose of ascertaining the daily pro rata of the cars to which such mine was entitled, any car whatever furnished such mine on such day embraced within classes 2, 3 and 4, that is, any company fuel car, foreign railway fuel car or private car. By this system, therefore, where a mine was entitled daily to a given pro rata of the cars subject to general distribution it received its full share of such cars, and in addition on that day also received such of the company fuel cars, foreign railway fuel cars and private cars as might have been sent to it for loading on that day. This absolute disregard in the allotment of the company fuel cars, foreign railway fuel cars and private cars was not in all respects common to all the systems which took no account of such cars in fixing capacity, since in some of the regulations one or the other of the classes was taken into account in fixing the pro rata for distribution.
Previous to 1907 the Railroad Commission of the State of Ohio filed with the Interstate Commerce Commission two *463 complaints against the Hocking Valley and another railroad company. These complaints were based upon the ground that the failure of the railroads in times of car shortage to include in the pro rata of cars for distribution foreign railway fuel cars and private cars, and to charge the mines which had received such cars with the same as part of their distributive share, created an undue preference and worked unjust discrimination in violation of the act to regulate commerce. On July 11, 1907, the report and opinion of the commission was announced in the cases referred to. R.R. Comm. of Ohio v. Hocking Val. Ry. Co., 12 I.C.C. Rep. 398. It was declared that the complaints were well founded, and the relief prayed was awarded. Nine days afterwards  presumptively in ignorance of the finding of the commission just referred to  the Illinois Central Railroad Company promulgated rules governing the distribution of cars to coal mines. Although by these rules foreign fuel cars, private cars and company fuel cars were not taken into account in ascertaining the capacity of a mine or mines, such cars were expressly directed not to be counted for the purpose of the daily distribution of cars among the respective mines. On August 15 following, however, presumably to cause the regulations to conform to the interpretation of the Interstate Commerce Act adopted by the commission in the Hocking Valley case, a circular was issued by the Illinois Central Railroad Company, to go into effect September 1, 1907, cancelling the circular of July 20, 1907, and directing that account should be taken in the distribution of cars to a particular mine or mines of both foreign railway fuel and private cars. Before the date fixed for the going into effect of this last-named circular the Majestic Coal and Coke Company, a West Virginia corporation, filed a suit against the Illinois Central Railroad Company in the United States Circuit Court for the Northern District of Illinois, complaining that to charge against its distributive share of coal cars, in the event of a car shortage, the fuel cars and private cars furnished it would violate its legal rights. After hearing, a temporary injunction, preventing the *464 going into effect of the regulations in the particulars mentioned, was issued. The distribution of coal cars thereafter continued to be made as provided in the prior circular.
With this prelude we come more immediately to the origin of the controversy before us.
On October 31, 1907, the Illinois Collieries Company filed with the Interstate Commerce Commission a complaint against the Illinois Central Railroad Company. The regulations of the railroad company as to the distribution of coal cars were assailed as unjustly discriminatory in violation of the act to regulate commerce, particularly as respected the practice of not taking into consideration foreign railway fuel cars and private cars in determining the distribution of coal cars among the various coal operators along the lines of the railroad on interstate shipments of coal. It appears that the complaint just referred to was heard before the commission, with two other complaints against other railroads involving the same general subject. In its report, which was filed in all three of the cases on April 13, 1908, Traer v. Chicago & Alton R.R. Co., 13 I.C.C. Rep. 451, the commission held that not to count in times of car shortage when the daily distributions were made against the mine receiving the same company fuel cars, foreign railway fuel cars and private cars was a violation of the act to regulate commerce. In announcing this conclusion reference was made to the previous opinion of the commission in the Hocking Valley case, supra, and it was declared that the Illinois Central Railroad Company on the hearing before the commission had conceded the controlling effect of the previous ruling of the commission. Considering the temporary injunction issued by the Circuit Court of the United States for the Northern District of Illinois, the commission declared that in view of the decision of this court in the case of the Texas & Pacific Ry. Company v. Abilene Cotton Oil Co., 204 U.S. 426, it was the duty of the commission to order the carrier to desist from the unlawful discrimination.
Although the complaint in the case of the Illinois Central *465 Railroad Company differed from the complaints in the two other cases which were considered and passed upon by the commission at the same time, in that it did not assail the failure to take into account the company fuel cars in making distribution in times of car shortage, nevertheless the commission declared that the Illinois Central Railroad Company, both in its brief and argument, had conceded the importance of the subject to that company and had invoked the action of the commission thereon.
The order of the commission, as heretofore stated, therefore not only directed the desisting from the practice of failing to take into account the foreign railway fuel cars, private cars and the company fuel cars, but also required the carriers to establish regulations for a period of two years from July 1, 1908, providing for the counting of all such cars. The general scope of the order was, however, qualified by expressly authorizing a railroad company to deliver to a particular mine all the foreign railway fuel cars, the private cars and the company fuel cars consigned or assigned to said mine, even although the number thereof might exceed the pro rata share of the cars attributable to said mine when ascertained by taking into account all the cars which the order required to be considered. Where, however, the number of such cars was less than the pro rata share of the mine the order only permitted the carrier to add a sufficient number of system cars to make up the rightful pro rata number.
Being unwilling to comply with the order of the commission, the Illinois Central Railroad Company commenced the suit which is now before us to enjoin in all respects the enforcement of the order of the commission. It was averred that although the company was adequately equipped with coal cars and with sufficient motive power and operative forces, yet at times an inadequate supply of coal cars to meet the demand arose from the circumstances which we have previously stated. It was alleged that the regulations adopted by the company for ascertaining the capacity of the mines *466 and for the distribution of cars were in all respects just and reasonable, and it was charged that the order of the commission, directing the taking into account of private cars in the distribution of cars, was unjust, unreasonable, oppressive and unlawful, because it deprived the owners of such cars of the right to the use of their own property. It was further alleged that, as to the foreign railway fuel cars, the order was also unjust, unreasonable, oppressive and unlawful, because such cars constituted no part of the equipment of the road, and, failing to count them, could not constitute an unlawful discrimination or the giving of an unjust preference within the intendment of the act to regulate commerce. Besides charging that the order to count the company fuel cars was unjust, unreasonable, etc., it was averred that the attempt of the commission to deal with such cars was beyond its power, and was but an effort to deprive the company of its lawful right to freely contract for the purchase of the fuel necessary for the operation of its road. In addition, the proceedings in the suit brought by the Majestic Coal Company were set out, the granting of a temporary injunction therein as to counting foreign railway fuel cars and private cars was alleged, and it was charged that in any event, as to those two classes of cars, the order of the commission was not lawful, since it compelled the company to violate the injunction which was yet in force. The commission answered by asserting the validity in all respects of the order by it made, substantially upon the grounds which had been set out in its report and opinion announced when the order was made. All the averments in the complaint as to want of power were traversed and it was expressly charged that the subject of the distribution of coal cars as dealt with by the order was within the administrative power delegated to the commission by the terms of the act to regulate commerce. The nature and character of the preferences and discriminations which had led the commission to conclude that unlawful discrimination and unjust preference arose from the failure to count the classes of cars referred to *467 was alleged in subdivision XIV of the answer, a portion whereof is reproduced in the margin.[1] A certificate as to the public importance of the cause was filed by the Attorney General, in compliance with § 16 as amended by the act of June 29, 1906, 34 Stat. 584, c. 3591, and the cause was thereafter *468 submitted at the same time with one brought by the Alton Railroad, involving a similar question, to a Circuit Court held by Judges Grosscup, Baker and Kohlsaat. A single opinion was announced in both cases. 000 Fed. Rep. 000. While deciding that the complainants were not entitled to relief in so far as the order of the commission concerned the counting of foreign railway fuel cars and private cars, it was yet held that the railway companies were entitled to an injunction restraining the enforcement of the orders of the commission in so far as they directed the taking into account of the cars employed by the company in hauling its own fuel. The conclusion on this latter subject was based upon the theory that, as the railroad companies took the coal which they bought for their own use from the tipple of a coal mine, and thereafter moved it for their own account and not for commercial purposes, the cars used for that purpose could not be treated as being engaged in commerce, as "commerce under these circumstances ends at the tipple." The court, however, observed:
"But this does not mean that these cars do not affect the problem of an equitable distribution of commercial equipment. The mine operators are objects of interest under the interstate commerce law, not as diggers of coal, but as shippers who tender a commercial product for transportation by interstate common carriers. The basis, therefore, on which the mines in a district should be rated is not their average output as a physical question, but the average output which they respectively tender for transportation in commerce."
And in accord with this reasoning it was in conclusion remarked *469 that the complainants as to the cars used for hauling their fuel were entitled to an injunction "against their being compelled to take fuel cars into consideration except as a means in determining the true capacities of the mines to tender coal to them for transportation in commerce."
From the final decree enjoining the commission from enforcing its order, in so far as it directed the taking into account the company fuel cars in the distribution of coal cars in times of car shortage and in so far as it directed the future taking such cars into account, the Interstate Commerce Commission appeals.
It is stated in the brief of counsel for the railroad company that, at the hearing below, despite the scope of the prayer of the bill, no question was raised by the railroad company as to the validity of the order of the commission to the extent that it controlled private cars and foreign railway fuel cars. Irrespective, however, of this admission, as the Interstate Commerce Commission alone has appealed, the correctness of the conclusions of the court below on these subjects is not open to inquiry. And this also renders it unnecessary to consider in any respect the effect of the injunction to which we have previously referred as issued in the suit filed on behalf of the Majestic Coal Company, since such injunction only related to foreign railway fuel cars and private cars. Besides, it is stated in the brief of counsel that before the decision of this case the preliminary injunction in favor of the Majestic Coal Company was dissolved and no appeal was taken therefrom.
In consequence of one of the comprehensive amendments to the act to regulate commerce, adopted in 1906, § 15, Act June 29, 1906, c. 3591, 34 Stat. 584, 589, it is now provided that "all orders of the commission, except orders for the payment of money, shall take effect within such reasonable time, not less than thirty days, and shall continue in force for such period of time not exceeding two years, as shall be prescribed in the order of the commission, unless the same shall be suspended *470 or set aside by a court of competent jurisdiction." The statute endowing the commission with large administrative functions, and generally giving effect to its orders concerning complaints before it without exacting that they be previously submitted to judicial authority for sanction, it becomes necessary to determine the extent of the powers which courts may exert on the subject.
Beyond controversy, in determining whether an order of the commission shall be suspended or set aside, we must consider, a, all relevant questions of constitutional power or right; b, all pertinent questions as to whether the administrative order is within the scope of the delegated authority under which it purports to have been made; and, c, a proposition which we state independently, although in its essence it may be contained in the previous one, viz., whether, even although the order be in form within the delegated power, nevertheless it must be treated as not embraced therein, because the exertion of authority which is questioned has been manifested in such an unreasonable manner as to cause it, in truth, to be within the elementary rule that the substance, and not the shadow, determines the validity of the exercise of the power. Postal Telegraph Cable Company v. Adams, 155 U.S. 688, 698. Plain as it is that the powers just stated are of the essence of judicial authority, and which, therefore, may not be curtailed, and whose discharge may not be by us in a proper case avoided, it is equally plain that such perennial powers lend no support whatever to the proposition that we may, under the guise of exerting judicial power, usurp merely administrative functions by setting aside a lawful administrative order upon our conception as to whether the administrative power has been wisely exercised.
Power to make the order and not the mere expediency or wisdom of having made it, is the question. While, as we have seen, the court below reasoned that the transportation of coal bought from a mine by the railroad company for its own use, after delivery to it in its coal cars at the tipple, was *471 not commerce, because "commerce under these circumstances ends at the tipple," it yet reasoned that such coal was within the control of the interstate commerce law to the extent that a regulation compelling its consideration, for the purpose of rating the capacity of a mine as a basis for fixing its pro rata share of cars in times of shortage, would be valid. Because of this reasoning, it is insisted, it appears that the court below but substituted a regulation which it deemed wise for one which it considered the commission had inexpediently adopted, and this upon the assumption by the court that its authority was not limited to determining power. Without intimating an opinion as to the merits of the proposition, we put it aside as irrelevant, since we must decide whether the action of the court below was correct, irrespective of the reasoning by which such action was induced. We further also dismiss from view a contention, strenuously insisted upon in argument by the Government, to the effect that in determining the issue of power we must treat the railroad company as being at fault for the failure to daily deliver all the cars called for in times of car shortage. We put it aside because it is in direct conflict with facts expressly admitted or impliedly conceded in the answer of the Interstate Commerce Commission, and from which facts we must take it for granted that the equipment of coal cars of the railroad company was reasonably adequate to meet all normal conditions, although it became insufficient at times because of extraordinary circumstances, against which it was in reason impossible to provide.
We think the issues for decision will be best disposed of by at once considering the contentions advanced by the railroad company to establish that there was a want of power in the commission to make that portion of the order which the court below enjoined. The contentions on this subject are stated in argument in many different forms, and if not in some respects contradictory, are, at all events, confusing since, considered logically, we think they virtually intermingle power *472 and expediency as if they were one and the same thing. We shall not, therefore, in making an analysis of the contentions, follow their mere form of statement, but shall treat them all as reducible to two propositions, viz: First. That the act to regulate commerce has not delegated to the commission authority to consider, where a complaint is made on such subject, the question of the distribution of company fuel cars in times of car shortage as a means of prohibiting unjust preference or undue discrimination. Second. That even if such power has been delegated to the commission by the act to regulate commerce, the order whose continued enforcement was enjoined by the court below was beyond the authority conferred by the statute.
As the Interstate Commerce Commission alone has appealed, it is patent that those portions of the order of the commission which concern foreign railway fuel cars and private cars, and which the court below refused to enjoin, are not open to inquiry. The suggestion at once presents itself whether, if these subjects are not open, they do not necessarily carry with them the question of company fuel cars, on the ground that the three classes rest upon one and the same consideration, and that to divorce them would bring about conditions of preference and discrimination which the act to regulate commerce expressly prohibits. In view, however, of the great importance of the questions directly arising for decision, and the fact that the court below has treated the company fuel cars as distinct, we shall not be sedulous to pursue the suggestion, and come at once to the propositions of power previously stated.
First. That the act to regulate commerce has not delegated to the commission authority to regulate the distribution of company fuel cars in times of car shortage as a means of prohibiting unjust preferences or undue discrimination.
When coal is received from the tipple of a coal mine into coal cars by a railway company, and the coal is intended for its own use and is transported by it, it is said there is no consignor, *473 no consignee and no freight to be paid, and therefore, although there may be transportation, there is no shipment, and hence no commerce. In changed form these propositions but embody the reasoning which led the court below to its conclusion that, under the circumstances, commerce ended at the tipple of the mine. The deduction from the proposition is, as the movement of coal under the conditions stated is not commerce, it is therefore not within the authority delegated to the commission by the act of Congress, as all such acts have relation to the regulation of commerce, and do not, therefore, embrace that which is not commerce. It is to be observed, in passing, that if the proposition be well founded, it not only challenges the authority of the commission, but extends much further, and in effect denies the power of Congress to confer authority upon the commission over the subject. In all its aspects the proposition calls in question the construction given to the law by the commission in every case where the subject has been before it, and also assails the correctness of numerous decisions in the lower Federal courts, to which we have previously referred, where the subject, in various forms, was considered. It goes further than this, since it, in effect, seeks to avoid the fair inferences arising from the regulations adopted by the railroad company. Those regulations, in providing for the obligation of the railroad company to supply cars, and recognizing the duty of equality of treatment, found it necessary, by express provision, to provide that private cars, foreign railway cars and company fuel cars should not be counted against the mine on the day when furnished, thus implying that, under the general rule of equality, if not restricted, it was considered the duty would exist to consider such cars. The contention, moreover, conflicts with the rule which, as we have seen, obtains in other and great systems of railroad, by which, for the purpose of avoiding inequality and preference, foreign railway fuel cars, private cars and company fuel cars are made one of the factors upon which a mine is rated in order *474 to fix the basis upon which its distributive share of cars is to be allotted in case of car shortage. And, from this, it must follow, if the proposition contended for be maintained, that it would not only relieve the railroad company, whose rights are here involved, from the obligation of taking into account its fuel cars in the making of the distribution, but from the duty even to consider them for the purpose of capacity rating. As a result, it would lead to the overthrow of the system of rating, prevailing on other railroads, by which, as we have said, such cars are taken into account, a consequence which is well illustrated by the case of Logan Coal Co. v. Pennsylvania R.R. Co., 154 Fed. Rep. 497.
Under these conditions, it is clear that doubt, if it exist, must be resolved against the soundness of the contentions relied on. But that rule of construction need not be invoked, as we think, when the erroneous assumption upon which the proposition must rest is considered, its unsoundness is readily demonstrable. That assumption is this, that commerce in the constitutional sense only embraces shipment in a technical sense, and does not, therefore, extend to carriers engaged in interstate commerce, certainly in so far as so engaged, and the instrumentalities by which such commerce is carried on, a doctrine the unsoundness of which has been apparent ever since the decision in Gibbons v. Ogden, 9 Wheat. 1, and which has not since been open to question. It may not be doubted that the equipment of a railroad company engaged in interstate commerce, included in which are its coal cars, are instruments of such commerce. From this it necessarily follows that such cars are embraced within the governmental power of regulation which extends, in time of car shortage, to compelling a just and equal distribution and the prevention of an unjust and discriminatory one.
The corporation as a carrier engaged in interstate commerce being then, as to its interstate commerce business, subject to the control exerted by the act to regulate commerce, and the instrumentalities employed for the purpose *475 of such commerce, being likewise so subject to control, we are brought to consider the remaining proposition, which is,
Second. That even if power has been delegated to the commission by the act to regulate commerce, the order whose continued enforcement was enjoined by the court below was beyond the authority delegated by the statute.
In view of the facts found by the commission as to preferences and discriminations resulting from the failure to count the company fuel cars in the daily distribution in times of car shortage, and in further view of the far-reaching preferences and discriminations alleged in the answer of the commission in this case, and which must be taken as true, as the cause was submitted on bill and answer, it is beyond controversy that the subject with which the order dealt was within the sweeping provisions of § 3 of the act to regulate commerce prohibiting preferences and discriminations. But it is contended that although this be the case, as the order of the commission not only forbade the preferences and discriminations complained of, but also commanded the establishment of a rule, excluding such discriminations for a future definite period of not exceeding two years, the order transcended the authority conferred upon the commission. This proceeds upon the assumption that § 15 of the act to regulate commerce, as enacted by the act of June 29, 1906, while conferring upon the commission the authority, upon complaint duly made, to declare a rate or practice affecting rates illegal, and to establish a new and reasonable rule or practice affecting such rates for a term not exceeding two years, has no relation to complaints concerning preferences or discriminations, unless such practices, when complained of, are of a character to affect rates, which it is insisted is not here the case. The pertinent part of the section in question (15) reads as follows, 34 Stat. 589:
"That the commission is authorized and empowered, and it shall be its duty, whenever, after full hearing upon a complaint made as provided in section 13 of this act, or upon *476 complaint of any common carrier, it shall be of the opinion that any of the rates, or charges whatsoever, demanded, charged, or collected by any common carrier or carriers, subject to the provisions of this act, for the transportation of persons or property as defined in the first section of this act, or that any regulations or practices whatsoever of such carrier or carriers affecting such rates, are unjust or unreasonable, or unjustly discriminatory, or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of this act, to determine and prescribe what will be the just and reasonable rate or rates, charge or charges, to be thereafter observed in such case as the maximum to be charged; and what regulation or practice in respect to such transportation is just, fair, and reasonable to be thereafter followed; and to make an order that the carrier shall cease and desist from such violation, to the extent to which the commission find the same to exist, and shall not thereafter publish, demand, or collect any rate or charge for such transportation in excess of the maximum rate or charge so prescribed, and shall conform to the regulation or practice so prescribed.
"All orders of the commission, except orders for the payment of money, shall take effect within such reasonable time, not less than thirty days, and shall continue in force for such period of time, not exceeding two years, as shall be prescribed in the order of the commission, unless the same shall be suspended or modified or set aside by the commission or be suspended or set aside by a court of competent jurisdiction."
The contention gives to the words found in the earlier part of the section, "any regulation or practice whatsoever of such carrier or carriers affecting such rates," a dominant and controlling power so as to cause them to limit every other provision in the section, however general in its language. We do not stop to critically examine the provision relied upon for the purpose of pointing out, as a matter of grammatical construction, the error of the contention, because we think, when the text of the section is taken into view and all its provisions *477 are given their natural significance, it obviously appears that the construction relied upon is without foundation, and that to sustain it would be to frustrate the very purpose which it is clear, when the entire provision is considered, it was designed to accomplish, and thus would be destructive of the plain intent of Congress in enacting the provision. The antecedent construction which the Interstate Commerce Act had necessitated, and the remedial character of the amendments adopted in 1906, all serve to establish the want of merit in the contention relied upon. In addition, to adopt it would require us to hold that Congress, in enlarging the power of the commission over rates, had so drafted the amendment as to cripple and paralyze its power in correcting abuses as to preferences and discriminations which, as this court has hitherto pointed out, it was the great and fundamental purpose of Congress to further.
Conceding, for the sake of the argument, the existence of the preferences and discriminations charged, it is insisted, when the findings made by the commission are taken into view and the pleadings as an entirety are considered, it results that the discriminations and preferences arose from the fact that the railroad company chose to purchase its coal for its fuel supply from a particular mine or mines, and that, as it had a right to do so, it is impossible, without destroying freedom of contract, to predicate illegal preferences or wrongful discriminations from the fact of purchase. But the proposition overlooks the fact that the regulation addresses itself, not to the right to purchase, but to the duty to make equal distribution of cars. The right to buy is one thing and the power to use the equipment of the road for the purpose of moving the articles purchased in such a way as to discriminate or give preference are wholly distinct and different things. The insistence that the necessary effect of an order, compelling the counting of company fuel cars in fixing, in case of shortage, the share of cars a mine from which coal has been purchased will be entitled to, will be to bring about *478 a discrimination against the mine from which the company buys its coal and a preference in favor of other mines, but inveighs against the expediency of the order. And this is true also of a statement in another form of the same proposition, that is, that if, when coal is bought from a mine by a railroad the road is compelled to count the cars in which the coal is moved in case of car shortage, a preference will result in favor of the mine selling coal and making delivery thereof at the tipple of the mine to a person who is able to consume it without the necessity of transporting it by rail. At best, these arguments but suggest the complexity of the subject, and the difficulty involved in making any order which may not be amenable to the criticism that it leads to or may beget some inequality. Indeed, the arguments just stated, and others of a like character which we do not deem it essential to specially refer to, but assail the wisdom of Congress in conferring upon the commission the power which has been lodged in that body to consider complaints as to violations of the statute and to correct them if found to exist, or attack as crude or inexpedient the action of the commission in performance of the administrative functions vested in it, and upon such assumption invoke the exercise of unwarranted judicial power to correct the assumed evils. It follows from what we have said that the court below erred in enjoining the order of the commission, in so far as it related to company fuel cars, and its decree is therefore reversed, and the case remanded for further proceedings in conformity with this opinion.
MR. JUSTICE BREWER dissents.
NOTES
[1] XIV. Defendant avers that the allotment by complainant of said foreign railway fuel cars, private cars, and complainant's fuel cars to the mines receiving them in addition to the full distributive shares of such mines in the general distribution of cars by complainant and the failure by complainant to count and charge said foreign railway fuel cars, private cars, and company cars against the mines receiving them, in said general distribution, results in undue and unreasonable preference or advantage to the mines and operators receiving such cars and subjects the owners and operators of mines which do not receive such cars to undue and unreasonable prejudice and disadvantage in the following respects, to wit:

(a) That the operator receiving the foreign railway fuel cars, private cars, or company fuel cars thereby receives a higher percentage of cars than mines of equal capacity which do not receive such cars.
(b) That the operator receiving the foreign railway fuel cars, private cars, or company fuel cars may operate his mine to a fuller capacity and thereby reduce the cost of coal per ton, resulting in an increased profit on his commercial coal.
(c) That the operator receiving foreign railway fuel cars, private cars, or company fuel cars is enabled to increase the number of working places in the mine, is enabled to develop his mine more rapidly, is enabled to increase his capacity rating, and in future reratings of such mine by complainant for the purposes of car distribution the mine would receive a higher rating and consequently a larger number of cars in complainants' general distribution of cars.
(d) That the operator receiving the foreign railway fuel cars, private cars, or company fuel cars is enabled thereby to secure and hold a larger, more efficient, and regular working force of miners and laborers.
(e) That the development of the mines which do not receive the foreign railway fuel cars, private cars, or company fuel cars is retarded in inverse ratio as the development of the mines receiving said cars is accelerated.
(f) That by the arbitrary allotment of the foreign railway fuel cars, private cars, or company fuel cars the complainant and the so-called foreign railways are enabled to secure low prices on railway fuel because the operator receiving such cars is enabled to produce his commercial coal at much lower prices than do the mines which do not receive such arbitrary cars.
(g) That the operator of the mine receiving the foreign railway fuel cars, private cars, or company fuel cars is thereby enabled to make contracts for the delivery of coal distributed over a long period, to an extent that the operator of the mines which do not receive such cars cannot do.