(120 So. 15)

No. 29397.

**MELLON, Director General of Railroads, v. J. M. BURGUIERES CO., Limited, et al.***

**In re J. M. BURGUIERES CO., Limited, et al.**

Jan. 2, 1929.

Rehearing Denied Jan. 28, 1929.

*For opinion conforming to mandate of Supreme Court, see 121 So. 215.

Milling, Godchaux, Saal & Milling, of New Orleans, for petitioners.

Denegre, Leovy & Chaffe and N. P. Phillips, all of New Orleans, for respondent.

O'NIELL, C. J. This is a suit for demurrage charges on railroad cars used for transporting sugar cane from the fields to the factory. The cars were furnished by the Morgan's Louisiana & Texas Railroad &

Steamship Company to the defendant J. M. Burguieres Company during the sugar-making season of November and December, 1919. The claim is for $253.38, with 5 per cent. interest from the 21st of February, 1920. The defendants are the J. M. Burguieres Company and the Globe Indemnity Company; the latter being the surety on a bond of $5,000, given by the J. M. Burguieres Company to guarantee the payment of all charges due on shipments made or delivered without prepayment of the freight charges. The J. M. Burguieres Company's defense is that the cars were exempt from demurrage charges, under a clause in the tariff, exempting private cars on private tracks; and that the railroad companies and the shippers and the Louisiana Public Service Commission, and its predecessor, the Railroad Commission of Louisiana, so construed the exemption clause in the tariff for many years previous to the filing of this suit. The Globe Indemnity Company urges the same defense, and contends also that the bond was given to secure only freight charges, properly so called, and not demurrage charges. The J. M. Burguieres Company, in its answer to the suit, set up a reconventional demand for $345.05, alleged to have been paid under protest and in response to a demand made for such demurrage charges under threat of discontinuance of the service.

The civil district court rejected the plaintiff's demand, on the ground that the cars were assigned to the exclusive use of the J. M. Burguieres Company during the sugar-making season of November and December, 1919, and were therefore exempt from demurrage charges, under the clause exempting private cars on private tracks; but the court rendered a judgment of nonsuit on the defendant's reconventional demand, finding the evidence not sufficient to sustain it. The plaintiff, Director General of Railroads, appealed to the Court of Appeal for the parish of Orleans; and the J. M. Burguieres Company, answering the appeal, prayed for judgment on its reconventional demand. The Court of Appeal reversed the judgment on the main demand, gave judgment in favor of the plaintiff as prayed for, against the defendants in solido, and, in consequence, rejected the J. M. Burguieres Company's reconventional demand. The case is before us on a writ of review issued at the instance of the defendants.

The demurrage tariff, under which this claim is made, issued November 1, 1919, effective December 1, 1919, contains the following exemption, viz.:

"Section B. The following cars are not subject to these demurrage rules:

"1. * * *

"2. * * *

"3. * * *

"4. Private cars on private tracks when the ownership of the car and the track is the same.

"Definitions.

"Private Car.—A car having other than railroad ownership. A lease of a car is equivalent to ownership. Private cars must have the full name of the owner or lessee painted or stenciled thereon or must be boarded with full name of owner or lessee. If name of lessee is painted, stenciled or boarded on car then the car is exempt from demurrage for the lessee only. If name of lessee is not painted, stenciled or boarded on car then the car is exempt from demurrage for the owner only.

"Private Track.—(a) A track or portion of a track which is devoted to the purposes of its user either by lease or written agreement."

Similar provisions were made in the tariffs in effect in 1916, 1917, and 1918; and there is nothing to show that such provisions were not contained in any former tariff regulation.

During the first year in which the railroads were under federal control, and in fact until these claims were made for demurrage occurring in November and December, 1919, no claim was ever made for demurrage on cane cars on the private tracks of the sugar cane planters or sugar manufacturers, for whose exclusive use the cars were assigned, respectively, for the sugar-making season. It was the understanding and agreement of the railroad companies and the shippers, from the beginning of the custom of shipping sugar cane to central factories instead of grinding it on the plantation where it grew, that the railroad cars assigned to a sugar factory for that purpose were not subject to demurrage charges while on private tracks, during the period for which they were assigned to the exclusive use of the factory; and that interpretation of the exemption clauses in the tariff regulations was approved by the Louisiana Public Service Commission, formerly called the Railroad Commission of Louisiana —as shown by the testimony of a member of the commission.

█ It is conceded, for the purposes of this case, and is a fact, that the tracks on which the demurrage is alleged to have occurred were the J. M. Burguieres Company's private tracks. The only question is whether the cars were properly classed as private cars. There were 150 of them assigned to the J. M. Burguieres Company for the season of 1919, and the company's name was painted or stenciled on each car. The freight charges paid by the company for cane hauled in these cars in November and December, 1919, amounted to $90,000. The agreement under which the cars were assigned to the company was not a contract of *lease*, in the technical sense of the word, but the cars were assigned to the exclusive use of the company as completely as if they were under lease; and the company's exclusive use and possession of the cars, during the determinate period of the sugar-making season, was such as to bring them as well within the definition of "private cars" as if they were, technically, under lease.

The sugar-making season, in Louisiana, lasts only 60 or 70 days, beginning in the latter part of October or first part of November, and ending about the end of December. The reason for the shortness of the season is that sugar cane is ripened by a frost and destroyed by a severe freeze. There is no way of preserving sugar cane for manufacturing purposes. It must be hauled to the factory as fast as it is cut down, and the harvesting and manufacturing process must be continued as rapidly as possible from the beginning to the end of the grinding season. In olden times every planter had a manufacturing establishment adequate to grind the cane raised on his plantation; but, since the advent of the large central factories, capable of extracting a higher percentage of juice from the cane, it is more profitable for the proprietors of the small farms to sell their cane to the proprietors of the central factories than to grind it on the farm. The J. M. Burguieres Company owns and operates such a factory, and, besides grinding the cane grown on the company's lands, buys large quantities of cane from other farmers. Sugar cane is a cheap commodity in comparison with its weight and bulk, and therefore requires a low freight rate—particularly as the rate is of the nature of a milling in transit rate. The transportation of sugar cane by railroad to central factories had its advent in Louisiana about 40 years ago, and has developed into a tremendous business; but its season is of such short duration that it is not profitable for the railroad companies to maintain cars suitable for that purpose; for cars which are suited to that service are not usable for any other service. They consist of flat cars with high-crated sides and ends, and roofless. The custom

which has prevailed since the beginning of the business is for the railroad company to assign to each factory, for its exclusive use during the grinding season, as many flat cars as the factory needs; and the manufacturer crates each car with crating which belongs to the manufacturer, and which is dismantled and retained by him when he returns the cars at the end of each grinding season. The railroad company pays $6 per car for the labor of putting on the crates. The railroad company places a sufficient number of empty cars on the switch near the hoist at each loading station, hauls the loaded cars to the factory, and returns the empties to the loading stations. There are no railroad stations or station agents at either end of the haul; and no bills of lading or other shipping papers are issued for the shipments. The switch tracks at the loading stations connect with the main line at only one end of the switch track; in consequence of which it sometimes happens that an empty car is jostled in and out for several days before it is loaded and hauled to the factory; whereas, if the cars were loaded in the continuous order in which they are placed on the side tracks, no car would ever remain there long enough to be subject to demurrage. A somewhat similar condition prevails at the factory, where it is sometimes impossible to unload the cars in the order in which they are brought in. These unavoidable conditions in the transportation of sugar cane from the field to the factory justified the recognition by the railroad companies and their patrons, and by the Public Service Commission, that the cars used in that service were not subject to the demurrage tariff during the period of their assignment to the exclusive use of the sugar manufacturers. It would be impracticable to carry on that particular transportation business if the cars were subject to demurrage charges while on the private tracks of the factory. There is no reason

why a cane car should be subject to demurrage charges during the period of its assignment to the exclusive use of a sugar manufacturer, for it is not intended to be returned to the railroad company for its general use at the end of each carload shipment. It is important, of course, to the railroad company, that each car should be used as constantly as possible, but it is not contemplated that a car assigned to that service for a specified period should be likened to a car employed for one carload shipment—and be required to be released to the railroad company within 48 hours after the rendering of the service, or be subject to demurrage.

Our opinion is that the interpretation which the railroad companies and the shippers and the Louisiana Public Service Commission have so long given to the exemption clauses in the demurrage tariff—and their application to cane cars during the period of their assignment to the exclusive use of a factory —is a reasonable and correct interpretation and application of the law.

It is argued on behalf of the plaintiff that this exemption clause in the demurrage tariff is not ambiguous, and, therefore, that the testimony showing the interpretation which the railroad companies and the shippers and the Louisiana Public Service Commission put upon the clause was irrelevant and inadmissible. The argument is a begging of the question, for the fact itself that the railroad companies and the shippers and the Louisiana Public Service Commission, in good faith and for many years, gave the clause an interpretation contrary to that which is contended for by the plaintiff in this case shows that the clause is ambiguous—if in fact it is subject to any other interpretation than that which it had for many years, and which is now for the first time disputed.

The Court of Appeal, in its opinion, declared that a leased car could not be deemed a private car, unless it was leased from an

owner other than a railroad company. That pronouncement is not warranted by any expression in the demurrage tariff. The expression is "A lease of a car is equivalent to ownership," which, of course, is not literally true, but intended as an illustration. A railroad company could not lease its cars for the purpose—or with the effect—of discriminating in freight rates, without violating the tariff regulations. But there is no accusation or showing in this case that the assignment of the cars to the exclusive service of the J. M. Burguieres Company for the period of the grinding season of 1919 operated as a discrimination in freight rates, or violated the tariff in that respect. The ruling in Chicago & Alton Railroad Co. v. Kirby, 225 U. S. 155, 32 S. Ct. 648, 56 L. Ed. 1033, is therefore not appropriate.

The case of Interstate Commerce Commission v. Illinois Central Railroad Co., 215 U. S. 452, 30 S. Ct. 155, 54 L. Ed. 280, is cited as describing "private cars" as "cars either owned by coal mining companies or shippers or consumers, and used for the benefit of their owners in conveying coal from the mines to designated points of delivery." That description of the "private cars" therein referred to was not given or intended as a definition of "private cars" generally, or within the meaning of the exemption clause in the demurrage tariff in question in this case—or in any other tariff regulation. The court was pronouncing upon the authority of the Interstate Commerce Commission to order a railway company to desist from its practice of not taking into account the company's fuel cars in the daily distribution of coal cars in times of car shortage to the bituminous coal mines on its line, and to require the railway company for a future period of two years to count such cars against the share of the mine receiving them. In the course of the opinion, the court observed that, in a general sense, all of the regula-

tions of the several railroads, either for ascertaining the capacity of coal mines, or in order to determine the pro rata share for daily distribution of cars to the respective mines in case of shortage, dealt with four classes of cars; among which classes was the third class, namely, "private cars, that is, cars either owned by coal mining companies or shippers or consumers, and used for the benefit of their owners in conveying coal from the mines to designated points of delivery." We do not find in the decision any expression pertinent to this case.

Having concluded that the J. M. Burguieres Company is not liable for the demurrage charges, there is no occasion for considering the Globe Indemnity Company's alternative or additional defense.

The Court of Appeal did not pass upon or consider the question of sufficiency of the evidence to sustain the J. M. Burguieres Company's reconventional demand for $345.05 alleged to have been paid under protest; for the court merely said: "The failure of the defendant to sustain its defense defeats its reconventional demand." As we have found that the defendant J. M. Burguieres Company did sustain its defense against the main demand, it is necessary that the proper appellate court should consider and pass judgment upon the sufficiency of the evidence to sustain the defendant's reconventional demand. We have concluded to reinstate the judgment of the civil district court rejecting the plaintiff's demand, and to remand the case to the Court of Appeal for a decision of the question of sufficiency of the evidence to sustain the defendant's reconventional demand.

The judgment of the Court of Appeal is annulled, and the judgment of the civil district court is reinstated and affirmed in so far as it rejects the plaintiff's demand, and the case is ordered remanded to the Court of Appeal for a decision of the question of sufficiency of the evidence to sustain the defend-

ant's reconventional demand. The plaintiff is to pay all court costs, except such as may be incurred hereafter in the Court of Appeal; the liability for which latter costs being dependent upon the judgment of that court on the reconventional demand.