**FLORIDA CITRUS COMMISSION et al. v. UNITED STATES et al.**

Civ. A. No. 597.

United States District Court
S. D. Florida, Orlando Division.

Aug. 31, 1953.

Maguire, Voorhis & Wells, Orlando, Fla., for plaintiffs.

James E. Kilday and Kenneth R. Harkins, Sp. Assts. to the Atty. Gen., Dept. of Justice, Washington, D. C., for the United States.

Leo H. Pou, Asst. Chief Counsel, I. C. C., Washington, D. C., for Interstate Commerce Commission.

Before STRUM, Circuit Judge, and BARKER and DE VANE, District Judges.

STRUM, Circuit Judge.

The purpose of this suit is to set aside orders [1] of the Interstate Commerce Commission relating to unloading charges on fresh fruits and vegetables at New York and Philadelphia, entered pursuant to the Commission's report on rehearing, dated May 7, 1952, 286 I.C.C. 119. See also 272 I.C.C. 648.

Plaintiffs are shippers of said commodities, and others interested in the marketing thereof. The Secretary of Agriculture of the United States intervened, as did also many marketing, transportation and terminal organizations, and public Commissions. The cause is submitted as on final hearing.

[1]. Order dated May 7, 1952, in Investigation & Suspension Docket No. 5500; and orders dated December 15, 1952, in Florida Citrus Commission v. B. & O. R. R. Co., Docket Nos. 31105 and 31106.

Substantially all carload shipments of fresh fruits and vegetables destined to New York City from the South and West are brought to the Jersey side of the Hudson River, and the freight cars, with their cargoes intact, are then ferried across the river on car floats. There are two methods of delivery on the New York side. One is to switch the railroad cars from the car floats to team tracks located on land in lower Manhattan, where the consignees unload the railroad cars and place the cargo directly onto trucks. There is no separate charge for these deliveries.

By the other method, with which we are here concerned, the railroad cars are not switched to land tracks, but remain on the car floats which are placed alongside unloading piers where the carriers unload the cars, placing the contents on the floor of the pier station, where they are picked up by the consignees. The consignees are not allowed to unload the freight cars themselves, as they do on the team tracks, as it is physically impossible to place the consignee's trucks alongside the car floats. The carriers therefore unload the cars, the consignees having access to shipments only after they have been unloaded and placed on the floor of the pier stations. Approximately 75% of the total traffic is handled in this manner, as the team tracks can accommodate only about 25% of the traffic, and it is not feasible to expand them.

For this unloading service the railroads, since November 1, 1948, have been authorized to make additional charges, over and above the line haul rates, at designated pier stations in Manhattan, first those proposed by the railroads and approved by the Commission, October 4, 1948, effective November 1, 1948, 272 I.C.C. 648, and later the lower rates approved by the Commission, May 7, 1952, 286 I.C.C. 119, here under attack. No delivery charges are imposed for other types of commodities unloaded at the pier stations in like manner as fresh fruits and vegetables. Prior to November 1, 1948, the carriers also unloaded fresh fruits and vegetables at pier stations without additional charges.

In Philadelphia, unloading operations are generally similar to those at New York, except that no car floatage is now performed, and the team tracks are more adequate, but there are designated stations at which the carrier performs the unloading before the consignee has access to the goods.

When certain carriers proposed to establish separate unloading charges at pier stations effective June 1, 1947, many shippers, including most of the plaintiffs here, protested. The Commission thereupon suspended operation of the schedules to December 31, 1947, and ordered an investigation to determine the lawfulness of the proposed charges. This proceeding is known as Investigation & Suspension Docket No. 5500, the final order in which, dated May 7, 1952, is one of the orders here under attack. See 286 I.C.C. 119.

Following a hearing before a Commission examiner, at which much evidence was presented by the carriers and opposing parties, and after oral argument and re-arguments, the Commission on October 4, 1948, issued its report in which it found that the proposed unloading charges were just and reasonable. 272 I.C.C. 648. The Commission thereupon vacated the suspension order and authorized unloading charges of $1.95, $2.28 and $2.60 per net ton, effective November 1, 1948, on designated groups of said commodities at designated pier stations, in addition to the through line haul rates.

The Commission concluded that these additional charges for unloading service are in substantially the same category as those for switching, transit, refrigeration, and other specific services for which charges are authorized, and that the then expense of unloading was such that the carriers should not longer be required to furnish the service without compensation.

Upon the petitions of many protestants, the Commission thereafter reopened the proceedings for a rehearing. Extensive further evidence was taken by two Commission examiners, who recommended that the charges be held unlawful, but the Commission overruled these recommendations, and entered its final report on May 7, 1952, in which it held that unloading costs should be borne in part by shippers and in part by the

carriers, and that not exceeding $1.05, $1.35 and $1.65 per ton would be reasonable charges to be paid by shippers. The Commission thereupon cancelled the existing higher charges, "without prejudice to the establishment of charges in conformity with the views expressed" in the report of May 7, 1952. The charges thus approved represented only a portion of the actual unloading cost.

On September 22, 1952, certain shippers again attacked the unloading charges approved on May 7, 1952, Docket No. 31105 referring to New York, and Docket No. 31106 referring to Philadelphia, asserting that the charges were unjust and unreasonable, enabling the carriers to make two charges for a single service. The Commission dismissed these proceedings by its order of December 15, 1952, which is also here under attack, holding that these petitions assailed the order on substantially the same grounds previously considered and overruled on May 7, 1952 in I. & S. Docket No. 5500.

In this action, brought pursuant to 28 U.S.C.A. §§ 1336, 1337, 1398, 2284 and 2321 to 2325, plaintiffs seek to enjoin and set aside the orders above mentioned. They contend that the line haul rate includes delivery to the consignee at destination, that no additional charge for unloading is justified when no additional service is rendered, and that none is rendered here. Plaintiffs further contend that in authorizing these charges, the Commission acted arbitrarily, unreasonably, unlawfully and contrary to the evidence; that the Commission could not consistently approve the additional unloading charges without first examining the line haul rates as to their adequacy to cover the unloading charges; that plaintiffs were denied an opportunity to be heard as to the justification for and reasonableness of the unloading charges of $1.05, $1.35, and $1.65, which were finally allowed; and that the Commission failed to give effect to section 15(7) of the Interstate Commerce Act, 49 U.S.C.A. § 15(7), which places the burden of proof in these matters upon the carriers.

■■ The fact finding and policy making authority in these matters is the Inter-state Commerce Commission, in whom Congress has reposed the duty and authority to determine whether charges of this character are appropriate, reasonable, and just. Arizona Grocery Co. v. Atchison, T. & S. F. R. Co., 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348; Pennsylvania R. Co. v. International Coal Mining Co., 230 U.S. 184, 196, 33 S.Ct. 893, 57 L.Ed. 1446, 1451; Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 54 S.Ct. 692, 78 L.Ed. 1260. It is not our function to review the Commission for mere error, nor are we authorized to reverse its findings even though, as original finders of fact, we might have reached a different conclusion on the evidence. It is for us to consider and decide only whether the Commission has acted within its statutory authority, has proceeded in accordance with the essential requirements of due process, has acted upon adequate findings, and whether in the record considered as a whole there is substantial evidence to support those findings. Rochester Tel. Corp. v. United States, 307 U.S. 125, 139, 59 S.Ct. 754, 83 L.Ed. 1147, 1157; I. C. C. v. Inland Waterways Corp., 319 U.S. 671, 691, 63 S.Ct. 1296, 87 L.Ed. 1655, 1668; I. C. C. v. Illinois Cent. R. Co., 215 U.S. 452, 470, 30 S.Ct. 155, 54 L.Ed. 280, 288.

■ The point at which a carrier's line haul service begins or ends is a question of fact to be determined by the Commission, not by the courts. The Commission's findings on that question will not be disturbed by the courts if supported by evidence. United States v. Wabash R. Co., 321 U.S. 403, 408, 64 S.Ct. 752, 88 L.Ed. 827, 831; I. C. C. v. Hoboken R. Co., 320 U.S. 368, 64 S.Ct. 159, 88 L.Ed. 107; United States v. American Sheet & Tin Plate Co., 301 U.S. 402, 57 S.Ct. 804, 81 L.Ed. 1186; United States v. Pan Amer. Pet. Co., 304 U.S. 156, 58 S.Ct. 771, 82 L.Ed. 1262; Baltimore & O. R. Co. v. United States, 305 U.S. 507, 525, 59 S.Ct. 284, 83 L.Ed. 318, 329; Swift & Co. v. United States, 316 U.S. 216, 649, 62 S.Ct. 948, 86 L.Ed. 1391; Atchison, T. & S. F. R. Co. v. United States, 295 U.S. 193, 55 S.Ct. 748, 79 L.Ed. 1382; Armour & Co. v. Alton R. Co., 312 U.S. 195, 61 S.Ct. 498, 85 L.Ed. 771.

Whether a terminal service, such as this unloading operation, shall in the circumstances involved be treated as in addition to, or as a part of, the service covered by the line haul rate, is a question upon which the findings of the Commission are conclusive, if supported by substantial evidence. Adams v. Mills, 286 U.S. 397, 410, 52 S.Ct. 589, 76 L.Ed. 1184, 1193. In the last cited case, the additional charge was disapproved. Although the historical aspects of that case bear a noticeable resemblance to this, and the additional charges were there disallowed, those are circumstances to be resolved by the Commission. A prior existing custom of performing the additional service without charge is not controlling. United States v. U. S. Smelting Co., 339 U.S. 186, 70 S.Ct. 537, 94 L.Ed. 750.

It is not essential that the Commission first review in detail the line haul rates before allowing the unloading charges under consideration. What the Commission is really deciding here is, not the adequacy or inadequacy of line haul rates to cover the unloading service, but where the carrier's line haul service ends, and whether unloading is a justifiable additional service, of value to the consignee, for which he should pay at least a part of the cost. As we have seen, determination of these matters is confided by Congress to the Commission, whose decision, if supported by substantial evidence, is conclusive on the courts, as these are discretionary administrative matters in a specialized field, recognized as such by Congress. While the Commission is not precluded from considering the through rate, it is not *required* to consider it in determining the reasonableness of a separately stated accessorial charge. Barringer & Co. v. United States, 319 U.S. 1, 63 S.Ct. 967, 972, 87 L.Ed. 1171, where the Supreme Court said: "But the decision whether the circumstances and conditions are such as to justify a difference in the accessorial charge, or rather to require that any adjustment be made in the line-haul charge, is one which the statute has left to the determination of the Commission, which Congress has entrusted with the power and duty of guarding against the prohibited favoritism."

The Commission has found that the level of line haul rates to New York and Philadelphia is no higher than the rates to other consumer points where shippers unload or where charges are asssessed for unloading. It has also found that unloading is an additional service, wholly distinct from delivery; that pier station unloading by the carrier in New York is essential, as the team tracks are inadequate, cannot be enlarged, and there are no physical means by which the consignee's trucks may reach the car floats; that this method of unloading saves the payment of switching charges by the consignee, avoids traffic congestion, and facilitates deliveries; and that it is beneficial to consignees, for the additional reason that in taking delivery on the pier station floor, the consignee has the advantage of displaying the entire contents of a car to prospective buyers, and of using the pier station facilities as a sales place. Comparable benefits accrue at Philadelphia.

Based upon these findings, which are amply supported by evidence, the Commission found that the line haul service terminated when the cars reached the pier station, just as they found it terminated at the interchange yards in the Tin Plate and Pan American Petroleum cases, supra, in which the Supreme Court accepted the Commission's findings as conclusive. The evidence also supports the Commission in finding that unloading by the carrier is a desirable and justifiable accessorial service, of value to the consignee, and that he should pay a part of the costs, and that conditions have materially changed since the time when the carrier performed that service without charge.

Plaintiffs assert that they were not given an opportunity to be specifically heard upon the reasonableness of the reduced rates of $1.05, $1.35, and $1.65 per ton, and claim that they were thereby denied due process. But the Commission had just concluded, not one but two, exhaustive and comprehensive investigations of the entire subject of unloading charges at these points, based upon the higher rates then in

effect, during which plaintiffs, and others, were afforded a full opportunity to be heard upon all phases of the subject. As a result of these hearings, the Commission found the existing rates too high, but that the reduced rates above mentioned would be reasonable, and that the charge was justified as for an additional service.

Instead of merely setting aside the old rates, thus leaving the matter undetermined, the Commission brought the controversy to a close by setting the old rates aside "without prejudice to the establishment of charges in conformity with the views expressed herein," that is, in the Commission's report. The carriers then put the reduced rates into effect.

Having just completed a thorough investigation of the entire subject, during which plaintiffs were fully heard, it would have been a work of supererogation to conduct a further hearing upon these lower rates, the reasonableness of and justification for which was already shown by the evidence. It was clearly within the Commission's power not only to condemn the then existing rates as unreasonable, but at the same time and upon the evidence already taken to fix rates that would be just and reasonable. In this, there was no denial of due process to plaintiffs. Plaintiffs were fully heard upon the entire matter. The situation is the same in principle as where a plaintiff demands $1,000 of a defendant, the court finding that he is not entitled to $1,000 but that on the evidence he is entitled to $500, and awards that sum. In these circumstances the defendant could not complain of a denial of due process because he was not again heard on his liability for $500. Akron, C. & Y. Ry. Co. v. United States, D.C., 22 F.2d 199, 203.

 Nor does it appear to us that the Commission erroneously relieved the carriers of the burden of proof cast upon them in these matters by section 15(7) of the Interstate Commerce Act. The Commission's "notice" of October 10, 1950, that the "record is deficient" as to certain evidence, and assigning the case for further hearing as to the comparative cost of team track and platform delivery, merely extended the evidence into an additional field of inquiry. Nothing appears in this procedure which tends to shift the burden of proof to others than the carriers.

In disposing of this matter, the Commission has clearly acted within its statutory authority; its proceedings have been conducted consistently with due process; its findings are adequate and supported by substantial evidence. In these circumstances, the relief sought by plaintiffs must be denied, and the complaint dismissed at the cost of plaintiffs.

Dismissed.

DE VANE, District Judge, dissents.

DE VANE, District Judge (dissenting).

The record in this case discloses it is the desire of the carriers affected to have the same unloading practices in effect at Philadelphia that are in effect at New York, and I will, therefore, confine this dissent to the situation at New York.

In my opinion the majority enlarges the authority of the Interstate Commerce Commission over specific freight rates to unprecedented and unauthorized limits. The Court in effect holds our review of the order of the Commission in this case is limited to the mere matter of due process; i. e., notice and hearing. In reaching this conclusion the court brushes aside the following undisputed factual questions which, in my opinion, are controlling of the case:

1. Unloading at New York was originally inaugurated by the carriers concerned for their own convenience and benefit.

2. It is now and always has been the most economical way the carriers may make deliveries of freight at New York.

3. The line-haul rates were originally established to include and have always included compensation for unloading costs at New York. The Interstate Commerce Commission has so held in numerous cases.

4. When the unloading charges were made effective by the Interstate Commerce Commission the line-haul rates were then, and are now, in excess of just and reasonable rates based upon the cost of transport-

ing and unloading fruits and vegetables at New York.

The first three points stated above are so thoroughly covered and completely presented by the report on rehearing proposed by Russell M. Brown and J. M. Walsh, Interstate Commerce Commission Examiners, and in the second report on further rehearing proposed by J. M. Walsh, Examiner, (Exhibits H and I to the complaint) that the Court considers it quite unnecessary to enlarge upon what the Examiners say on these points in the two reports. They concluded in each report that the carriers failed to meet the burden of proof that the assail charges were just and reasonable, and therefore failed to meet the requirements of Section 15(7) of the Interstate Commerce Commission Act. Having reached this decision, they concluded in the first report that it was unnecessary to consider whether there was also a violation of Sections 2 and 3 of the Act. In the second report Examiner Walsh also found and held that the proposed unloading charges were in violation of Section 3(1) of the Act.

In my opinion the carriers not only failed to meet the requirements of Section 15(7) of the Act, but the evidence in the case also clearly establishes a violation of Sections 2 and 3(1) of the Act. Unloading is performed by the carriers of almost all perishable freight consigned to New York. The unloading charges are made applicable only to fruits and vegetables, while other similar perishable products, such as butter, butter solids, cheese, eggs, dressed poultry, fresh meat, fish, oysters and raw milk, are unloaded by the carrier without the imposition of any unloading charges. This, in my opinion, constitutes a clear violation of Sections 2 and 3(1) of the Act.

The fourth point enumerated above was not considered by the examiners or the Interstate Commerce Commission when this case was before the Commission. The examiners merely held that under Section 15(7) of the Act, the obligation rested upon the carriers to show the reasonableness of the line-haul rates and it was because of the carriers' failure to meet this burden that they recommended the proposed un-

loading charges be cancelled. The Interstate Commerce Commission simply brushed aside the question of the reasonableness of the line-haul rates and decided the case solely on the reasonableness of the unloading charges.

At the time the Commission had this case under consideration it also had under consideration a general application for an increase in freight rates (interstate and intrastate) throughout the United States to meet rising costs and diminishing passenger revenue. As a result of the application for this general increase the Commission allowed a thirty percent increase in freight rates, chiefly to make up for passenger operating deficits. 264 I.C.C. 695; 266 I.C.C. 537; 269 I.C.C. 33; 270 I.C.C. 81, 93, 403. The legality of this action on the part of the Commission was challenged in King v. United States, 344 U.S. 254, 73 S.Ct. 259. On the record in that case the carriers frankly conceded that the railroads of this country by and large are making a substantial profit out of their overall freight service, and that considered alone, increases in freight rates could not have been justified in that case on the ground that the railroads needed the additional revenue to pay the cost of rendering freight services and a fair return on the property devoted to such services. The difference between that case and this case is of grave importance as to the power of the Interstate Commerce Commission over freight rates. In the former case there was a general increase made in freight rates to cover the heavy losses resulting from passenger operations. Congress having authorized such action and the Interstate Commerce Commission having taken such action, the Court did not have the authority to override the same. In this case, however, the carriers have limited their efforts to secure increases in rates to a small segment of freight transportation and the Commission by its order has cast a burden upon this small segment of transportation that is not placed upon any other commodities. To hold that the Interstate Commerce Commission has the authority under the Interstate Commerce Act to so discriminate against fruits and vegetables or any other

classes of commodities is to vest in the Commission authority not to be found in the Interstate Commerce Act. The decision in King v. United States, supra, is so far-reaching in its effect upon freight rates that a grave duty rests upon the Courts to restrict the carriers and the Commission to the principles announced in that case and where, as in this case, it appears that the line-haul rates are in excess of just and reasonable rates additional accessorial charges limited to particular classes of freight should not be countenanced.

Assuming the carriers are entitled to additional compensation for the cost of unloading freight at New York and Philadelphia, their remedy, under the Interstate Commerce Act, is to secure it by agreement with connecting carriers affected or make application to the Commission for a greater division of the line-haul rates to cover the needed additional costs instead of loading such costs on the farmers of this country.

In my opinion, the order of the Commission of May 7, 1952, 286 I.C.C. 119, clearly violates Sections 2, 3(1) and 15(7) of the Interstate Commerce Act and, for this reason, is illegal and should be set aside.